Louis Frank Montesi, Sr., Plaintiff in Error,

*v.*

State of Tennessee, Defendant in Error.

417 S.W.2d 554.

(*Jackson*, April Term, 1967.)

Opinion filed June 26, 1967.

JOHN M. HEISKEL and FRANK J. GLANKLER, JR., of counsel, MONTEDONICO, GILLILAND, HEISKELL, DAVIS, CANALE & GLANKER, Memphis, for plaintiff in error.

GEORGE F. McCANLESS, Attorney General, THOMAS E. Fox and ALBERT D. NOE, IV, Assistant Attorneys General, Nashville, for defendant in error. PHIL M. CANALE, JR., District Attorney General, ROBERT K. DWYER and JAMES C. BEASLEY, Assistant District Attorneys General, Memphis, prosecuted case for the State in trial court.

Mr. Special Justice William J. Harbison delivered the opinion of the Court.

In this case plaintiff in error, Louis Frank Montesi, Sr., was convicted of voluntary manslaughter in connection with the homicide of his wife, Evelyn Montesi, who died of a gunshot wound inflicted upon her at her home in Memphis, Tennessee, on the evening of November 2, 1965. Plaintiff in error has appealed to this Court and has assigned several errors. For convenience, plaintiff in error will be referred to herein as he appeared in the trial court; that is, as the defendant.

The evidence against the defendant in this case was entirely circumstantial. There were no eyewitnesses to the homicide and the defendant did not testify at the trial.

Defendant and his wife had been married for many years, and they lived in a large home in Memphis, Tennessee. Their sixteen year old daughter, Vicki Montesi, resided in the home with them. The home was so constructed as actually to consist of two residences, and in a separate part of the house the mother of the defendant

had her home. At the time of the homicide, about 9:30 o'clock, P.M., on November 2, 1965, only the defendant and his wife were downstairs in their part of the residence. Their daughter was upstairs in her bedroom with the door locked, and the mother of the defendant was in her separate quarters in another wing of the house.

Mrs. Montesi died of a gunshot wound in the right breast. It appears that one of the fingers of her right had was also penetrated by a bullet, probably the same one which entered her breast.

Blood was found in various portions of the residence of defendant and his wife. Blood was found in the den of the home, and from there a trail of blood led into the front entrance hall, and blood was also found about half-way up the stairway leading to the second floor where the daughter of defendant and his wife had her room. Spots of blood also were found in positions which would indicate that Mrs. Montesi probably went back down the stairway to the opening between the front hall and the living room and then back through the hallway into the den and out a sliding door leading onto a patio at the rear, or west side, of the den. She was found by police officers lying on the grass outside the patio near the northwest corner of the home. Mrs. Montesi made no outcry and spoke no words, insofar as the record reveals, after police officers arrived, although she was still living when they first reached the scene. Defendant himself was observed by several witnesses to have had a laceration on the back of his head, a puncture wound on his forehead, and scratches on the right side of his neck.

Police investigation of the homicide began with the receipt at about 9:40 o'clock, P.M., at Police Headquar-

ters of a telephone call from a Mrs. Claudia Boyd Seagle, asking that police officers be sent to the Montesi home. Mrs. Seagle made the call at the request of the defendant who appeared at her door dressed in pajamas and requested that she call police, stating that he had been robbed. A police patrol car in the vicinity received the call and responded immediately by going to the Montesi residence. After the arrival of the first police car at about 9:45 o'clock, P.M., the defendant was under constant surveillance by police at his home until he was transported under arrest to Police Headquarters later in the evening. Some hours after the shooting took place his hands were subjected to a paraffin test at the instance of the police, but this test proved to be negative for traces of gunpowder.

Throughout the evening defendant was questioned by a number of police officers and many of them testified at the trial, quoting the contents of their conversation with him. Defendant denied having shot his wife; and while he produced a pistol which he kept in the residence and turned this over to the officers, it was shown by ballistics tests not to have been the murder weapon. When questioned by police officers, defendant first stated that he did not recognize the assailant or could not identify him, but thereafter he stated that the assailant resembled or appeared to be one Donald Bersacola of Boston, and since shortly after the death of his wife defendant has insisted that his wife was shot and killed by this individual.

Police officers quoted the defendant as having stated to them that he retired shortly after 9:00 o'clock, P.M. Earlier in the evening other members of his family visited him and his wife, these being two married children and their spouses. The married children and their

spouses left shortly before 9:00 o'clock, P.M. After the defendant retired, he stated that his wife came into the bedroom, that she changed to her pajamas, and that he asked her to bring him a newspaper. He is quoted as saying that she did so, and that she then said that she was going to stay up a little while longer and returned to the den. The defendant is then quoted as saying that he had read part of the newspaper when he heard the doorbell ring. A short time later he heard his wife screaming something about "Robbers, Robbers." He stated that he jumped from his bed and ran through the hall into the dining room, and as he entered the dining room door leading to the vestibule, he saw his wife lying on the floor and that a man was standing over her. Defendant is quoted as stating that he was himself attacked by the intruder and that he turned and fled back through the dining room. He also ran through the den and stated that he threw an ashtray at his assailant. He contended that the injuries which he received were inflicted upon him by this person.

For some time after the arrival of the police, the defendant demonstrated to various police officers the locations in the house where he claimed the various incidents had occurred. He seems to have related the events of the evening to a number of officers, and some of them noted discrepancies in his accounts of the events.

In addition to finding traces of blood about the Montesi residence, police officers also found in the entrance hall six .32 caliber cartridges, one spent and five unspent. They also found various items of furniture disturbed or in disarray in the living room and den or playroom. Mrs. Montesi's eyeglasses and bedroom slippers were found at the entrance to the living room. Later, when her body

was taken to the morgue, a police officer noted that the fingernails on her left hand were heavily filled with matter, and subsequent microscopic examination thereof indicted that this material contained fragments of skin. The skin was never identified as being that of the defendant, nor was there sufficient blood with the skin to reveal the type of blood. Nevertheless, because defendant had scratches on the right side of his neck which could have been made by fingernails, the State has contended that these facts would support a finding that Mrs. Montesi had scratched her husband in a fight or encounter with him. The existence of the scratches on Mr. Montesi's neck and the material found under Mrs. Montesi's fingernails are probably the strongest links in the State's chain of evidence and are among the most incriminating circumstances shown against the defendant.

It appears that the defendant and his wife had known one Donald Bersacola for some months prior to the incident in question, and had been in his company on two other occasions. Bersacola had visited in the home of Mr. and Mrs. Montesi in September, 1965, a little more than one month prior to the death of Mrs. Montesi. An unpleasantness had occurred between Mr. Montesi and Bersacola on that occasion. There is no evidence in the record to indicate that Montesi had any way of knowing where Bersacola was on the evening of November 2, 1965, or that there had been any contact between them for a substantial period of time prior to November 2, 1965. When police began investigating Donald Bersacola, however, they found that he was actually in Memphis on the night of the homicide and that he was staying in a motel which was shown by proof to have been within four minutes driving time of the Montesi residence.

No fingerprints of any sort were taken at the Montesi residence, nor was Bersacola subjected to a paraffin test. The State introduced evidence, however, to the effect that paraffin tests are frequently unreliable. Further, Bersacola was not located by Memphis police until nearly six hours after the homicide, and apparently the police saw no necessity for conducting a paraffin test at that time. Bersacola was interrogated by the police at Headquarters, and he gave them a written statement, denying any implication whatever in the homicide. He testified as a witness for the State at the trial, and denied killing Mrs. Montesi or being at the Montesi home on the evening of November 2, 1965.

The character of this witness was seriously attacked upon cross-examination, and it was shown that he was heavily in debt at the time of the homicide, and that he was a person of questionable moral character, to say the least. He was at the time a traveling salesman for a company which manufactured shopping carts of the type used in grocery supermarkets. His previous contact with Mr. Montesi had been in connection with efforts to sell such carts to Montesi, who has an interest in a chain of grocery stores in Memphis. Bersacola testified that he had arrived in Memphis during the late afternoon of November 2, 1965, and he denied that there had been any prior contact between him and Montesi on that date, either before or after Bersacola's arrival in Memphis.

Bersacola gave a detailed description of his activities in Memphis on the evening of November 2, 1965, and the morning of November 3, 1965. He contended that he generally had been in the motel since evening, having left on one occasion, however, to purchase a box of fried chicken. Being unable to locate a place near the motel

which he thought he remembered, he returned to the motel and thereafter obtained directions as to where he could purchase some chicken. He stated that he followed these directions, bought the chicken and returned to the motel. At about 10:10 o'clock, P.M., Memphis time, he called his wife in Massachusetts and thereafter called a Mrs. Sondra Hunt, also in Massachusetts. Bersacola had been intimate with the latter on many occasions, and on several occasions she traveled with him. Bersacola testified that after the second call he went to sleep, but was awakened about 4:00 o'clock, A.M., Memphis time, by a telephone call from his wife, and also a call from the Stoneham, Massachusetts police advising him that the Memphis police were looking for him. He received a second call from his wife about twenty minutes later, and shortly thereafter the police arrived at his room.

Some several days after the homicide, a property owner whose backyard adjoined the motel at which Bersacola was staying found a box of cartridges in his backyard, near the back fence. The incinerator of the motel was close to this area. These cartridges generally were of the same character as those found in the Montesi residence, and the six cartridges found in the Montesi home could have come from the same box.

The only other person shown without controversy to have been in defendant's portion of the Montesi residence at the time of the homicide was the sixteen-year-old daughter of defendant, Vicki Montesi. It appears without question that she was upstairs in her bedroom, and that she saw none of the events which transpired below, although she heard some of them taking place. At the request of the State, Vicki Montesi was called to testify as a witness of the court, and not as a witness for either

party. Without any direct examination or preliminary questioning by the court, she was turned over to the State for cross-examination, and then counsel for the defendant was permitted to cross-examine her. This procedure, the manner in which Vicki Montesi was questioned, and admissibility of evidence given by or attributed to her are the subject of major assignments of error here.

The uncontroverted portions of the testimony of Vicki Montesi are that on the evening of November 2, 1965, she, her father, mother and grandmother had dinner at home. Thereafter they were joined by her brother and his wife, and her sister and the sister's husband. Mr. and Mrs. Montesi had just returned from a pleasure trip to the Bahamas, and Vicki testified that the parents told the others of their experiences on the trip. She said that there was no disagreement or unpleasantness whatever while she was part of the family group. During the evening she went to a record shop to get a needle for the family record player, taking her boyfriend with her. She left him at his home before returning to her home.

Upon her return, which was at sometime prior to 9:00 o'clock, P.M., the married children and their spouses were leaving. Vicki testified that she went to her room at about 9:00 or 9:15, P.M. She does not purport to have actually seen anything that took place subsequently until after her mother had been shot, although she did hear certain sounds and disturbances going on below. She stated that she had been in her room for about fifteen minutes when she heard crashes and disorder, and sounds like rumbling and furniture being knocked over. She testified that she heard heavy breathing and heard screaming from her mother. The only voice or words which she identified were those of her mother who screamed:

"Don't kill me! Don't kill me! Vicki, help, help!" Vicki did not hear a shot. She testified that she did hear the doorbell ring, and heard sounds like those of her mother going to the door. She heard the door open but did not hear it shut. Immediately after the door opened the disturbance began. She testified that the disturbance or racket continued for five to ten minutes, and only after it ceased did she leave her room and go downstairs.

During the turmoil, Vicki called her boyfriend, Charles Sullivan, on the telephone and had a conversation with him, Sullivan was later permitted to testify, over objection of the defendant, as to this conversation, the trial court deeming the remarks of Vicki to be part of the res gestae.

Upon the trial of the case the defendant called as a witness the Criminal Court Clerk, who testified on direct examination concerning certain subpoenas which had been issued by the State. On cross-examination he testified as to some subpoenas which had been issued by the defendant. Thereafter he was permitted by the trial judge, over objection of the defendant, to testify that among his official records there was an indictment against Donald Bersacola, charging him with the murder of Mrs. Montesi in the first degree. The indictment, he testified, had been returned by the grand jury as a "No True Bill."

█ The trial of this case consumed many days, and the record is voluminous. The jury found the defendant guilty of voluntary manslaughter, and fixed his sentence at ten years in the Penitentiary. Of course, as is pointed out by the State, under T.C.A. sec. 39-2410, this sentence should properly be not less than two years nor more than

ten years, and the State suggests that the judgment should be modified and corrected accordingly.

The defendant has filed some ten assignments of error, one of which relates to the action of the trial court in refusing the defendant's pre-trial motion for permission to discover and inspect medical and scientific data gathered by the State and in its possession, arising out of or resulting from the post-mortem examination or autopsy performed upon the body of Mrs. Montesi. Another of the assignments of error complains of the action of the trial court in failing to grant a new trial upon the basis of newly discovered evidence. Because of the disposition which we find it necesary to make of this case, it is not necessary to dispose of these or of several other assignments, except to the degree hereinafter indicated.

As we have previously stated, the evidence against the defendant in this case was entirely circumstantial. Despite the voluminous record compiled in the case, we are constrained to the view that the State's case against the defendant was at best tenuous. If the State carried the burden of proof resting upon it to exclude every other reasonable hypothesis than guilt of the defendant, at a minimum it is safe to say that the issue was extremely close. We are of the opinion that the trial court admitted for consideration by the jury incompetent evidence; and, in view of the nature of the case, we are unable to say that the errors in this regard were harmless or non-prejudicial.

In several opinions, this Court has stated:

In a criminal case the effect of the admission of incompetent evidence upon the jury in a case where the record, without the incompetent evidence, reflects doubt

of guilt is viewed in a different light than a record where, without the incompetent evidence, there is a reasonable doubt of guilt. *Sambolin v. State,* 215 Tenn. 569, 574, 387 S.W.2d 817 (1965); *Chadwick v. State,* 219 Tenn. 296, 409 S.W.2d 367, 369 (1966).

■ Such is the situation here. We think without question that the trial judge erred in admitting in evidence the testimony of the Criminal Court Clerk that the grand jury had returned a "No True Bill" in connection with an alleged indictment of Donald Bersacola. We cannot consider that this testimony was competent for any purpose under the record before us, and we are of the opinion that it was extremely prejudicial to the defendant. In closing argument, the Assistant District Attorney General, referring to Mr. Montesi's accusations against Bersacola, said:

Twelve good and true men sitting on the grand jury didn't buy it, Gentlemen of the Jury, and I don't believe twelve good men such as yourselves, Gentlemen of the Jury are going to buy it.

Of course, there is no evidence whatever in the record before us as to what the grand jury did or did not consider in connection with the purported indictment of Bersacola. In any event it is not apparent to us how the conclusions of a group of grand jurors in connection with the indictment of Bersacola could in any way be relevant or competent evidence on the trial of the defendant Montesi.

In overruling the objection of counsel for Montesi to this evidence, the trial judge stated: "It is a matter that involves probable cause."

■■ With deference to the trial judge, we respectfully disagree. It is well settled in this State that an accused himself on trial may not be asked about pending indictments against him on cross-examination. *Brooks v. State,* 187 Tenn. 67, 77, 213 S.W.2d 7, 11 (1948); *Sissom v. State,* 210 Tenn. 556, 360 S.W.2d 227 (1962). The reasons stated in these opinions are applicable here; that is, that an indictment at best is a mere accusation, and raises no presumption of guilt. It is purely hearsay, being merely the conclusion or the opinion of a body of men based on ex parte evidence. By the same token, the returning of a no-true bill by a group of grand jurors at best simply constitutes the conclusions of that particular body based upon such evidence as may happen to have been presented to it.

We are firmly of the opinion that the action of the trial court in admitting this testimony over objection was prejudicial error and that the testimony was incompetent for any purpose. Accordingly, the assignment of error relating to this evidence is sustained.

■ We also are of the opinion that the trial judge was in error in admitting as part of the res gestae statements allegedly made by Vicki Montesi to her boyfriend, Charles Sullivan, on the telephone while the disorder or struggle was going on in her home on the floor below. This testimony is generally to the effect that Vicki Montesi called Sullivan on the telephone and asked him to come after her. He stated that she said to him on the telephone: "I believe Mother and Daddy are fighting."

As has already been pointed out, Vicki was not in position to see what was taking place in the residence, and all of the opinions and conclusions which she formed

were based upon things which she heard taking place outside her room, most of them being downstairs.

■ Tennessee, like most states, recognizes the rule admitting evidence of a spontaneous declaration or excited utterance, and the Tennessee cases do not confine such evidence to statements of an actor or participant in the event. A statement of a person who is a by-stander, if sufficiently spontaneous and contemporaneous is admissible. See *Morton v. State*, 91 Tenn. 437, 444, 19 S.W. 225 (1892); *Cooper v. State*, 123 Tenn. 37, 125, 138 S.W. 826 (1909).

As pointed out in Wigmore on Evidence, the better view is that an excited utterance of a by-stander is just as admissible as that of a participant or an actor,

> * * * assuming, of course, that the by-stander's declarations *relate only to that which has come under his observation.* VI Wigmore, Evidence sec. 1753 (3rd ed. 1940). (Emphasis supplied).

See also 20 Am.Jur., Evidence sec. 674. In the encyclopedia just cited, the following statement is made:

> With respect to the question as to the admissibility of a declaration of a non-participant as affected by evidence or lack of evidence that he actually observed the act or fact, the res gestae exception to the hearsay rule cannot properly dispense with the requirement that in some way, at least, and with some degree of persuasive force, it must appear that the declarant was in reality a witness to the thing which he declared. Yet the cases will not justify the statement that it must appear by direct evidence that the declarant observed the specific act or fact declared; but only that it must appear, at least inferentially, that he was present and

that his declaration arose from personal observation; and it must not appear that the declarant did not personally witness the thing declared. 20 Am.Jur., Evidence, sec. 674 (Supp.1967).

In the present case it affirmatively appears that Miss Montesi did not witness the events which were taking place in her house, and we are of the opinion that her conclusions as to what was occurring were clearly inadmissible. Most certainly this testimony was prejudicial to the defendant. It was at best a statement of opinion or a conclusion which she had reached based upon things which she could not possibly have seen or witnessed, and, therefore, the testimony was inadmissible. See *McKenzie Transport Leasing Co. v. St. Louis Public Service Co.*, 349 S.W.2d 370 (Mo.App. 1961).

Accordingly, it results that the assignments of error pertaining to the admission of the statements made by Vicki Montesi in her telephone conversation with Charles Sullivan, and similar statements made by her in telephone conversations to police authorities are sustained.

Other assignments of error made before us relate to the action of the trial judge in calling Vicki Montesi as a "Court's witness" and permitting her to be cross-examined by both parties without himself conducting a direct examination.

The practice of having the court call a witness as its own in criminal cases has not previously been approved by this Court. It has received approval in a limited number of states and in some of the federal courts. See Annot. 67 A.L.R.2d 538. Some of the jurisdictions which have approved the practice have limited it to the calling of actual eyewitnesses for whose credibility neither side wishes to vouch.

██ We are of the opinion that the trial judge has discretion to call witnesses in criminal cases, but it is a discretion which must be carefully and cautiously exercised. See 2 Wharton, Criminal Evidence sec. 704 (12th ed. Anderson 1955). It should be exercised with special care and discretion in a jurisdiction like Tennesee, where a trial judge is forbidden to comment upon the evidence. Tennessee Const. Art. VI, sec 9. It is, of course, well settled in this state that if a party calls a witness who later proves to be hostile, such witness may be impeached by the party calling him. See *King v. State,* 187 Tenn. 431, 435 215 S.W.2d 813 (1948). This practice will in most cases be sufficient without the court itself calling witnesses on its own initiative.

██ Since this case must be re-tried, we are of the opinion that if the trial judge should see fit to call this witness as the court's witness on the second trial, the trial judge himself should conduct direct examination of the witness or see that she be given the opportunity of a full direct examination before turning her over to cross-examination by both parties. The only justification for calling a witness as a court's witness is to further the interests of justice. We are of the opinion that a witness so called should be given the opportunity of testifying on direct examination before being subjected to lengthy and involved cross-examination.

The judgment of the trial court is reversed and this case is remanded for further proceedings not inconsistent with this opinion.

BURNETT, CHIEF JUSTICE, and DYER and CHATTIN, JUSTICES, concur.

CRESON, JUSTICE, not participating.