# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT JACKSON

### JULY 1998 SESSION

FILED

December 29, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| Appellee, | ) | C.C.A. No. 02C01-9708-CC-00300 |
| | ) | |
| vs. | ) | Haywood County |
| | ) | |
| **DWIGHT MILLER,** | ) | Hon. Dick Jerman, Jr., Judge |
| | ) | |
| Appellant. | ) | (First Degree Murder) |

FOR THE APPELLANT:

**THOMAS W. CRIDER**
District Public Defender

**J. DIANE STOOTS**
**WILLIAM D. BOWEN**
Asst. District Public Defenders
107 S. Court Square
Trenton, TN  38382

FOR THE APPELLEE:

**JOHN KNOX WALKUP**
Attorney General & Reporter

**PETER M. COUGHLAN**
Asst. Attorney General
425 Fifth Ave. N., 2d Floor
Nashville, TN  37243-0493

**CLAYBURN L. PEEPLES**
District Attorney General

**LARRY HARDISTER**
**GARRY BROWN**
Asst. District Attorneys General
110 College St., Ste. 200
Trenton, TN  38382

OPINION FILED:_____

**REVERSED AND REMANDED**

**JAMES CURWOOD WITT, JR., JUDGE**

## OPINION

The defendant, Dwight Miller, appeals from the conviction of first degree murder he received at the conclusion of a jury trial in the Haywood County Circuit Court. Miller is presently serving a life sentence in the Department of Correction for his crime. In this direct appeal, he raises numerous issues for our review:

1. Whether the state violated <u>Brady v. Maryland</u> by failing to provide the defense with information about uncharged crimes allegedly committed by two prosecution witnesses.

2. Whether the trial court erred by asking defense counsel in the presence of the jury why defense counsel kept asking the same question of the state's witnesses.

3. Whether the trial court erred by placing one of the state's witnesses in custody as a means of improving her memory after the witness testified she could not remember events about which she had previously given a statement.

4. Whether the trial court properly denied the defense motion to have the jury view the crime scene, or alternatively, a videotape of the crime scene.

5. Whether the trial court properly determined that a witness was unavailable and allowed her testimony at the preliminary hearing to be admitted as evidence.

6. Whether the trial court had the authority to reverse its previous ruling granting the defendant's motion for a new trial.

7. Whether the trial court properly prevented the defense from viewing a full Tennessee Bureau of Investigation report.

8. Whether the cumulative effect of the alleged errors has prejudiced the defendant and compromised the judicial process.

After conducting a thorough review of the parties' briefs and the applicable law, we find reversible error which requires that we remand the case for a new trial.[1]

---

[1]Our discussion of the issues is ordered differently than as presented by the defendant.

In the light most favorable to the state, the facts of this case as relevant to this appeal are as follows. The defendant shot and killed Donald Rice in the early morning hours of April 20, 1995. Rice and the defendant were both sitting in their cars, which were parked driver's window to driver's window, outside a housing project in Brownsville, Tennessee when the defendant fired the fatal shot. The next day, Rice's body and car were discovered in separate locations by law enforcement officers.

Eyewitness testimony of Clement Harris, who was sitting outside the housing project at the time of the crime, established the defendant as the perpetrator.

The preliminary hearing testimony of Nina Champion, who the court declared was an unavailable witness, was read into the record. It established that Champion saw a shotgun in the trunk of the defendant's car shortly before the murder.

A law enforcement officer testified that he found a shotgun which smelled as if it had been recently fired in the defendant's home, along with a spent and a live shotgun shell. The shells were of the same type shot as was recovered from the victim's body.

The medical examiner testified that the victim died from a shotgun wound to the head.

Sheila Bernil and Kathy Blackwell, who were roommates, testified that the defendant came to their home around the time of the murder and was very insistent that he be allowed inside. They did not allow him entry, but Blackwell saw

3

the defendant a few hours later. The defendant told her that the victim was dead. At this time, the victim's body had not yet been discovered.

After the jury returned a guilty verdict and the court sentenced the defendant to life imprisonment, the defense filed a motion for new trial. The trial court granted the motion in March 1997, finding that the state had not been forthcoming with the defense about a non-prosecution "deal" with one of the state's witnesses. However, the court filed an "amended order" overruling the motion for new trial on July 7, 1997 following the court's receipt and review of a Tennessee Bureau of Investigation ("T.B.I.") report which addressed the alleged prior uncharged misconduct of the state's witness who was the purported beneficiary of the "deal." The T.B.I. prepared the report as a result of the trial court's order that the prosecution request the agency to investigate the matter. The trial court provided the defense with some, but not all of, the documents generated by the T.B.I. The entire report was filed under seal by the trial court and is contained in the record on appeal.

Against this unusual backdrop, the defendant calls upon us to consider his several allegations of error.

I

First, we consider whether the trial court properly overruled the defendant's motion for a new trial. Intertwined in this issue are the considerations of (1) whether the trial court correctly determined there was no <u>Brady</u> violation requiring the grant of a new trial, (2) whether the court properly considered information contained in a report from the T.B.I. in making its decision without providing the entire report to the defense, and (3) whether the court, after initially granting the defendant's motion for a new trial, had the authority months later to

4

vacate the order and overrule the motion. We begin with consideration of the latter issue.

A judgment in a criminal case becomes final 30 days after its entry or overruling of a motion for new trial, and thereafter, a trial court has no jurisdiction to modify it. State v. Charles Alvin Haney, No. 839 (Tenn. Crim. App., Knoxville, Mar. 29, 1989) (citations omitted); see also State v. Jack Lee Thomas, Jr., No. 03C01-9504-CR-00109, slip op. at 2-3 (Tenn. Crim. App., Knoxville, Nov. 15, 1995). We are aware of no rule, however, which imposes the same restrictions on rulings of the trial court which do not terminate a criminal case.

In determining whether the trial court retained jurisdiction to reverse the order beyond 30 days, we refer to the Rules of Appellate Procedure. As a general proposition, only those actions of a trial court which conclude a prosecution form the proper basis for an appeal as of right. See Tenn. R. App. P. 3(b). Interlocutory actions of the trial court are immediately reviewable by the appellate court only by permission. See Tenn. R. App. P. 9, 10; accord State v. Joseph D. Bishop, No. 01C01-9309-CR-00333 (Tenn. Crim. App., Nashville, Sept. 1, 1994) (interlocutory appeal of trial court's grant of a new trial); State v. Johnny Joe Crass, Jr., No. 03C01-9211-CR-418 (Tenn. Crim. App., Knoxville, Mar. 29, 1994); State v. John Edward Coleman, No. 88-302-III (Tenn. Crim. App., Nashville, Mar. 21, 1989). With respect to appeals as of right, Rule of Appellate Procedure 4(c) provides for various dispositions from which a party to a criminal action may take an appeal as of right under Rule 3 -- *denial* of a motion for a new trial, grant or denial of a motion for judgment of acquittal, grant or denial of a motion for arrest of judgment, or grant or denial of a motion for suspended sentence.[2] Unlike any of these rulings, which

_____

[2]Failure to take an appeal within the time allowed brings finality to the ruling, which generally is no longer subject to attack on its merits. See Tenn. R.

5

can generally be characterized as ones which bring a prosecution to an end at the trial level, an order *granting* a new trial has the singular effect of ensuring further proceedings in the prosecution. In other words, a grant of a new trial is not an action which brings finality to a criminal prosecution.

Accordingly, we believe the trial court acted within its jurisdiction when it reversed its previous ruling granting the defendant's motion for a new trial. The grant of the motion did not have the effect of concluding the proceedings. See Tenn. R. App. P. 3(b). To the contrary, the trial court's grant of a new trial ensured that further proceedings would follow. Because the order was one of this type, it did not become irrevocable by the trial court after the expiration of 30 days. But cf. Benson v. Fowler, 43 Tenn. App. 147, 306 S.W.2d 49 (1957) (order granting motion for new trial subject to alteration or recall for remainder of term of court or 30 days if term lasted that long); Turney v. Lamont, 60 Tenn. (1 Baxt.) 265 (1872) (error to reverse ruling granting motion for new trial made conditional on payment of costs because costs had not been paid two years after motion granted).

Having established the trial court's jurisdiction to revisit its order, we turn to the question of whether it reached the correct determination when it did so. The decision whether to grant a new trial is a matter for the sound discretion of the trial court. State v. Burns, 777 S.W.2d 355, 360 (Tenn. Crim. App. 1989). Thus, our inquiry is whether the trial court abused its discretion.

In this case, the basis for the initial grant of a new trial was the court's concern that the state had violated the requirements of Brady v. Maryland. In Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), the United States Supreme Court

---

App. P. 4(a) (appeal as of right must be taken within 30 days of entry of judgment, although time period is not jurisdictional in criminal cases).

6

held that the prosecution has the duty to furnish exculpatory evidence to the accused upon request. Any "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87, 83 S. Ct. at 1196-97. The duty to disclose extends to all "favorable information" regardless of whether the evidence is admissible at trial. State v. Marshall, 845 S.W.2d 228, 232-33 (Tenn. Crim. App. 1992); Branch v. State, 4 Tenn. Crim. App. 164, 168, 469 S.W.2d 533, 536 (1969). In United States v. Bagley, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380 (1985), the Supreme Court held that both exculpatory and impeachment evidence fall under the Brady rule. Cf. Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763 (1972) (nondisclosure of state's deal with witness violated defendant's due process rights).

Before an accused is entitled to relief under Brady, he must establish several prerequisites: (a) the prosecution must have suppressed the evidence; (b) the evidence suppressed must have been favorable to the accused; and (c) the evidence must have been material. See Bagley, 473 U.S. at 674-75, 105 S. Ct. at 3379-80; Brady, 373 U.S. at 87, 83 S. Ct. at 1196-97; Workman v. State, 868 S.W.2d 705, 709 (Tenn. Crim. App. 1993); State v. Marshall, 845 S.W.2d 228, 232; Strouth v. State, 755 S.W.2d 819, 828 (Tenn. Crim. App. 1986). In State v. Spurlock, this court recognized a fourth prerequisite to relief, that "the accused must make a proper request for the production of the evidence, unless the evidence, when viewed by the prosecution, is obviously exculpatory in nature and will be helpful to the accused." State v. Spurlock, 874 S.W.2d 602, 609 (Tenn. Crim. App. 1993) (citations omitted). The defendant bears the burden of proving a Brady violation by a preponderance of the evidence. State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995).

7

In the case *sub judice*, Sheila Bernil, a prosecution witness, was alleged to have been involved with Barbara Blade in stealing, forging and cashing checks that belonged to another individual. Blade implicated Bernil and was ultimately convicted for the scheme. Bernil was never prosecuted, and the defense argued that no information about Bernil's alleged wrongdoing was ever revealed. The defense further questioned whether some sort of non-prosecution agreement existed between Bernil and the state, consideration for which was Bernil's testimony in the defendant's murder trial.

At the first of four hearings on the motion for new trial, Investigator Johnny Blackburn testified that he was aware that Bernil had been implicated by Barbara Blade in a forgery scheme when Blade was arrested thereon. Investigator Blackburn had investigated this information but had not been able to develop sufficient evidence to charge Bernil. Significantly, he had been unable to locate a key witness. At this first hearing, the trial court indicated its skepticism of the prosecution's claim there was no deal with Bernil. The court asked the prosecution to request a T.B.I. investigation of whether there was sufficient evidence to charge Bernil, whether a non-prosecution deal had been struck with Bernil, and whether the prosecution or the officers knew Bernil might be charged with a crime at the time of her testimony.

At the second hearing held seven days later, the trial court became inflamed and ordered a new trial when the prosecution announced that it had not contacted the T.B.I. about the investigation. However, the court insisted on the T.B.I. inquiry, even after making his ruling.

8

Thereafter, the T.B.I. investigation took place,[3] although its scope appears to have been limited to the facts of Bernil's alleged crimes. The report does not reflect any investigation of alleged deal-making between Bernil and the state.[4] The report includes Blade's statement implicating Bernil in the scheme. A grocery store manager who refused to cash a check for Blade recalled Bernil attempting to cash a check on the theft/forgery victim's account the same day.

A letter contained in the sealed portion of the record indicates that the T.B.I. investigation report was sent to the trial court *ex parte* by the District Attorney General.[5] The defense apparently learned that the report had been completed and moved the court to receive access to the report.[6] A third hearing was held, at which the trial court announced that it had reconsidered its previous grant of a new trial in light of the information contained in the T.B.I. report. The court went on to vacate its previous order granting a new trial and substituted in its place an order denying the defendant's motion for a new trial. The court acknowledged that it was catching the defense by surprise and allowed, "I'll be glad for [the defense] to file any motions . . . to attack [the ruling]." The court also granted in part and denied in part the defendant's motion for access to the T.B.I. report, physically delivering portions

---

[3]The trial court ordered the prosecution to contact the T.B.I. and request the inquiry. When the court learned that the prosecution had not done so, the court stated on the record that it would contact the director of the T.B.I. himself. However, the T.B.I. report indicates the investigation was commenced upon request of the District Attorney General.

[4]There is a statement by the investigating agent that Bernil had not been charged because Brownsville Police Department officers were unable to obtain sufficient evidence of Bernil's involvement after conducting witness interviews. The report contains no information identifying the source of this information -- no statements of the Brownsville officers who conducted these interviews, no identification of the witnesses interviewed by the Brownsville officers, and no transcription of the interviews themselves.

[5]The cover letter from the district attorney general to the trial court does not reflect that the defense was copied with the communication.

[6]The defense claimed the report might contain information relevant to the defendant's upcoming retrial.

9

of the file to the defense in open court. He ordered the complete file sealed and made a part of the record.

Thereafter, the defense filed an amended motion for new trial alleging the trial court erred in denying complete access to the T.B.I. file and in reversing its previous order on the motion for new trial. An affidavit of Jimmy Johns, who was the witness the investigator claimed he had been unable to locate, was attached to the amended motion. In it, Mr. Johns claimed he had unwittingly passed a check at Bernil's request which was drawn on the theft/forgery victim's account. Mr. Johns further averred that he had never been interviewed by the Brownsville Police or the T.B.I. A fourth and final hearing was held at which the court upheld its rulings from the third hearing.

Initially, we find ourselves unable to address the defendant's Brady concern *vis-a-vis* the trial court's ultimate ruling on the new trial motion. As discussed above, one of the Brady requirements is that the information in question be material. In this case, the information relied upon by the trial court in making its final ruling on the motion for new trial was never disclosed to the defense. The nondisclosure had the effect of denying the defense an opportunity to demonstrate the materiality of some or all of the information in the T.B.I. report, and we are hesitant to speculate in that regard.[7]

Notwithstanding our inability to resolve the Brady question on the

_____

[7]The defense has the burden of proving a Brady violation. However, in this case, the trial court's actions denied the defense an opportunity to carry its burden. Furthermore, the materiality of the information in the T.B.I. report may not be readily apparent to this court, as the defense may be in possession of additional evidence which was not placed into the record but which would demonstrate the materiality of the T.B.I. report information. The defendant cannot be held at fault for failing to present evidence which he had no way of knowing was germane.

10

record before us, we find another issue determinative of the outcome. This court is concerned with the combined activity of the trial court in procuring the T.B.I. investigation, receiving it *ex parte,* and declining to disclose all of the report to the defense. In effect, the trial court inquired into facts-in-issue outside the record, and even though the court relied on the results of its inquiries, it kept its discoveries from the defense. Such a situation deprives the defendant of his opportunity to be heard in that he cannot respond to unknown information.

We recently addressed a similar situation in State v. Hart, 911 S.W.2d 371, 376 (Tenn. Crim. App. 1995). In that case, the petitioner sought a writ of error coram nobis. He claimed that the child whom he had been convicted of sexually abusing had recanted her inculpatory trial testimony. Hart, 911 S.W.2d at 372. A hearing was conducted, and the child recanted her trial testimony. Hart, 911 S.W.2d at 373. After the hearing, however, the child apparently recanted her recantation; in other words, she reasserted the veracity of her trial testimony. Hart, 911 S.W.2d at 374. The child's reaffirmation of her trial testimony came to the court's attention outside the record. Hart, 911 S.W.2d at 375-76. Further, the trial court also learned from sources outside the record that the petitioner had performed unfavorably on a polygraph examination. Hart, 911 S.W.2d at 375-76. In its order denying the petition for writ of error coram nobis, the trial court recited as findings of fact both the victim's recantation of her recantation and the unfavorable polygraph performance. Hart, 911 S.W.2d at 375-76.

In finding reversible error in Hart, we observed, "It is a well-established principle of law that a 'judge is not permitted to make an investigation of a case, even an inadvertent one, off the record, and then base a holding on the information

11

obtained . . .'"[8] <u>Hart</u>, 911 S.W.2d at 376 (citations omitted). Such is contrary to the "correct ideals of judicial procedure," violative of the Code of Judicial Conduct and the Rules of Evidence, and is incompatible with appellate review. <u>Hart</u>, 911 S.W.2d at 376 (citations omitted).

In the case at bar, the trial court sought information outside the record and used it as the basis for its final ruling denying the motion for a new trial. These actions were amplified by the trial court's failure to disclose the information to the defense, thereby denying the defense of the opportunity to evaluate the information and respond to it. Furthermore, the trial court received this information in a prohibited *ex parte* communication. <u>See</u> Tenn. R. Sup. Ct. 8, DR 7-110(B) (prosecutors); Tenn. R. Sup. Ct. 10, Canon 3(B)(7) (judges).

Given the multiplicity of these errors, we are compelled to find, in accord with <u>Hart</u>, that reversible error has occurred. If this were the only impropriety in the record, we would remand the matter with instructions that the T.B.I. report be disclosed to the defense and a new hearing on the motion for new trial be held following that disclosure. At such hearing, the defense would have the opportunity to present its case for <u>Brady</u> violations in light of the information contained in the T.B.I. report. However, in light of our discussion in section VI below, there is other error of record which warrants the grant of a new trial. Accordingly, the defendant will receive appropriate relief by the prosecution providing the T.B.I. report during pre-trial discovery in the proceedings which will take place on remand.[9]

---

[8]We do not consider the trial court's inclusion of the sealed report in the appellate record to be curative of <u>Hart</u>'s prohibition against an "off the record" judicial investigation.

[9]Any issues which present themselves based upon information contained in the report are capable of being addressed in pre-trial motions.

**II**

There is a second component to the defendant's <u>Brady</u> claim which we did not discuss above because it was not raised until after the trial court had reversed its order granting a new trial. The defendant asks us to find prejudicial error in the state's failure to disclose information that Clement Harris and Sheila Bernil were involved in a forgery scheme which is apparently unrelated to the one involving Bernil and Blade. The record contains Bernil's written confession and an officer's report implicating both Bernil and Harris.[10] Again, we find ourselves unable to resolve this issue on the record before us.

As stated above, one of the <u>Brady</u> considerations is materiality. In <u>Kyles v. Whitley</u>, 514 U.S. 419, 436, 115 S. Ct. 1555, 1567 (1995), the Supreme Court observed that the materiality of the suppressed evidence should be considered "collectively, not item-by-item." <u>See also</u> <u>State v. Edgin</u>, 902 S.W.2d 387, 389 (Tenn. 1995). In this case, we are unable to assess the materiality of the impeachment evidence against these two key prosecution witnesses collectively, per <u>Kyles</u>, because we have no way of assessing the materiality of the undisclosed evidence discussed in section I. above.

That said, our inability to assess this materiality of this undisclosed evidence is of no consequence in light of our grant of a new trial discussed in section VI below. However, had we not found reversible error elsewhere in the record, we would be constrained to remand this matter to the trial court for consideration of the materiality of this evidence collectively with the other undisclosed evidence discussed above, as mandated by <u>Kyles</u>.

---

[10]This information appears to have been disclosed as "pre-trial discovery" in preparation for the new trial (that new trial later being pretermitted by the trial court's ruling reversing the grant of a new trial).

We move next to the question of whether the trial court properly determined that Nina Champion was unavailable and allowed her testimony from the preliminary hearing to be admitted as evidence. The defendant claims his constitutional right of confrontation was impermissibly curtailed by the admission of Champion's former testimony. On appellate review, the trial court's determination of admissibility will not be reversed unless the court abused its discretion in admitting or excluding the challenged evidence. See, e.g., State v. Bigbee, 885 S.W.2d 797, 806 (Tenn. 1994).

In Tennessee, admission of former testimony is governed by Tennessee Rule of Evidence 804, which provides a hearsay exception for the former testimony of a declarant who is unavailable as a witness if the testimony was

> . . . given as a witness at another hearing of the same or a different proceeding or in a deposition taken in compliance with the law in the course of the same or another proceeding, if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination.

Tenn. R. Evid. 804(b)(1). Before such testimony will be admitted, however, the proponent must establish that the witness "is absent from the hearing and the proponent of [the] statement has been unable to procure the declarant's attendance by process." Tenn. R. Evid. 804(a)(5).

Further, in cases such as the one at bar in which the prosecution seeks to offer the former testimony of an unavailable witness, we have said that the state must establish two prerequisites in order to satisfy the defendant's constitutional right of confrontation. First, the state must show that the declarant is truly unavailable after good faith efforts to obtain her presence, and second, that the

evidence carries its own indicia of reliability.[11] State v. Arnold, 719 S.W.2d 543, 548 (Tenn. Crim. App. 1986) (stating the rule of Ohio v. Roberts, 448 U.S. 56, 100 S. Ct. 2531 (1980)).

In the case at bar, both prongs of the prerequisite test are satisfied.[12] First, with respect to the prosecution's good faith effort to secure Nina Champion's presence, Officer Johnny Blackburn testified that he went to the home of Sam Ethel Williams, who is Ms. Champion's mother, two or three times over the course of a year and questioned her about her daughter's whereabouts. Officer Blackburn reasonably followed up on the leads that Ms. Williams provided; however, it would be an understatement to say that she was less than forthcoming with Officer Blackburn. See Roberts, 448 U.S. at 75-76, 100 S. Ct. at 2544 (great improbability that further efforts would yield favorable results removes them from realm of

---

[11]At one time, there was a third requirement, that the evidence not be crucial or devastating. See State v. Henderson, 554 S.W.2d 117, 119 (Tenn. 1977). More recent caselaw seems to have disposed of this third requirement. See, e.g., State v. Grover Jesse Campbell, No. 1113, slip op. at 6, n.2 (Tenn. Crim. App., Knoxville, Dec. 20, 1989) (noting supreme court's denial of permissive appeal in two cases in which court of criminal appeals had dispensed with "crucial and devastating" rule); see also Arnold, 719 S.W.2d at 548 ("crucial and devastating" rule inapplicable where right of confrontation has been satisfied). However, the rules of evidence make no mention of this additional requirement.

[12]The record reflects that a brief hearing was conducted to determine the admissibility of Ms. Champion's former testimony. No evidence was presented; the state relied entirely on the assertions of the assistant district attorney about law enforcement's efforts to locate the witness. As we observed in State v. Armes, 607 S.W.2d 234, 237 (Tenn. 1980), "The prosecuting attorney's statement to the Court concerning the efforts of the State's investigator to locate the witness cannot be considered as evidence of proof on the issue of the State's good faith effort." Notwithstanding, the trial court allowed admission of the witness's former testimony. Although the state should have been held to its burden of production, we are able to determine from other information in the record that the error was harmless. Specifically, the record reveals that the witnesses with relevant information about the state's efforts to locate Ms. Champion were questioned outside the presence of the jury in a hearing to determine the admissibility of hearsay statements allegedly made by Champion to her mother. The testimony adduced at this hearing, which is discussed in the body of this opinion, establishes that the previous testimony was properly admitted.

reasonableness required of prosecution).  Process had been issued.  According to Ms. Williams, someone had been at her home attempting to serve a subpoena on Champion.  Second, "the indicia of reliability requirement is met by those hearsay exceptions resting upon such solid foundations that admission of virtually any evidence within them comports with the right of confrontation."  State v. Causby, 706 S.W.2d 628, 631 (Tenn. 1986); see also Roberts, 448 U.S. at 66, 100 S. Ct. at 2539.  The former testimony exception rests upon such a foundation.  Causby, 706 S.W.2d at 631.

The admission of Nina Champion's former testimony did not abridge the defendant's right of confrontation.

**IV**

The defendant challenges the trial court's denial of his motion to have the jury view the crime scene, or alternatively, view a videotape of the crime scene.  Whether to allow a jury view of the crime scene and whether to admit a videotape into evidence are both questions for the sound discretion of the trial court, and the trial court's decisions in that regard will not be disturbed on appeal absent a clear showing of abuse of that discretion. State v. Cauthern, 967 S.W.2d 726, 743 (Tenn. 1998) (videotape); Boyd v. State, 4 Tenn. Crim. App. 687, 707-08, 475 S.W.2d 213, 222 (1971) (jury view).

In his motion to allow the jury view, the defendant argued, "it's a physical impossibility when it's dark at night to see [where the defendant allegedly shot the victim] from where [Clement Harris, the eyewitness] says he was.  It just can't be done."  It appears the defendant requested that the jury make a nighttime trip to the crime scene.  The trial court overruled the motion, finding, "I just don't think it's proper to load up a jury and take them off down there.  It's a different time

16

of the year. I don't know what has changed about it or it'd be too speculative." During the course of the trial, the public defender's investigator testified about his own observations at the scene, including lighting and distances. The investigator was unable to identify individuals standing outside some parked cars while standing at less of a distance than Harris had testified he was from the location of the murder. The investigator sketched a diagram, which was admitted as evidence. Photographs of the scene were admitted.

We fail to see that the trial court abused his discretion in overruling the defendant's motion for a jury view. The defendant does not challenge the accuracy of the photographs or the diagram which were admitted, and the defense investigator's testimony was directly contrary to Harris' claim that he saw the defendant commit the crime.[13] Indeed, it is a rare occasion on which a jury view will be allowed. State v. Barger, 874 S.W.2d 653, 655 (Tenn. Crim. App. 1994). We believe the location of the crime was adequately described, and Harris' claim that he saw the defendant kill the victim was a credibility determination for the jury's resolution. Cf. State v. Deanna Stafford, No. 87-95-III (Tenn. Crim. App., Nashville, May 19, 1988) (defendant not denied fair trial by court's denial of jury view where crime scene was adequately described to the jury), perm. app. denied (Tenn. 1988).

The defendant's alternative claim is that the trial court should have admitted a videotape of the crime scene. The defense investigator who made the tape was questioned outside the jury's presence about the tape. He said he recorded it at 9:30 to 9:45 p.m. on the Sunday night prior to trial.[14] He admitted that

---

[13]Harris also testified he heard the defendant speak and recognized his voice.

[14]The murder took place in the early morning hours of April 20, 1995. This court judicially knows that the Sunday night preceding trial was August 4, 1996.

17

the amount of light recorded by a camera is less than the total amount of light seen by the human eye. He could not say how much light reduction occurred with the camera used to tape the scene. He also testified about the weather conditions on the night he was at the scene, which were different than the conditions on the night of the crime as established through other witnesses. The trial court viewed the videotape, then ruled that "the tape can in no way approximate what the eye could see" and that it would not be fair to allow the jury to see the tape.

Having considered these facts and viewed the proffered videotape, we conclude the trial court did not abuse its discretion in excluding the tape from evidence. The camera used recorded less light than would be seen by the human eye. The tape was filmed under different conditions than those which existed when the crime occurred. The poor quality of the videotape is such that it is apparent it depicts a low-light situation differently than as seen by the human eye.

V

The defendant also alleged that the trial court erred by questioning of defense counsel in the presence of the jury about the reason defense counsel kept asking the same question of the state's witnesses. More specifically, the state's first three witnesses were an investigator from the Haywood County Sheriff's Department, an investigator from the Brownsville Police Department, and the eyewitness Clement Harris. The first question asked of each of these three witnesses on cross examination was whether he was going to testify about gunshot residue. When the question was asked the third time (during cross-examination of Harris), the following dialogue occurred:

THE COURT: Mr. Crider [defense counsel], why do you keep asking that question? I assume you've got some reason for asking that.

MR. CRIDER: Yes, sir. I just want to know when I find the

18

witness --

THE COURT:    Do you really think this witness is going to testify about gunshot residue?

MR. CRIDER:    I'm going to question him about the firing of the gun in the car.

THE COURT:    All right.  If you do, go ahead and ask the question.  If you don't, don't ask it.

MR. CRIDER:    Yes, sir.

Whereupon, defense counsel undertook cross-examination of the witness on the subject of drug use on the night of the murder.

In his brief, the defendant argues that this line of questioning was part of his strategy to demonstrate that none of the state's witnesses would be able to provide testimony about gunshot residue on the defendant or his vehicle. He claims that the court's comments (1) questioned his strategies, if not his abilities, in front of the jury and constituted a comment on the evidence contrary to article VI, section 9 of the Tennessee Constitution, and (2) abridged his right of confrontation because it forced him to curtail cross-examination of state's witnesses.

Article VI, section 9 of the Tennessee Constitution declares that trial judges "shall not charge juries with respect to matters of fact, but may state the testimony and declare the law."  We disagree, however, that the above-quoted dialogue amounted to constitutionally impermissible judicial commentary on the evidence.  Rather, the trial court's questions and ruling were brief and to the point. The trial courts of this state are afforded wide discretion in controlling the conduct of counsel.  See, e.g., State v. Leach, 684 S.W.2d 655, 659 (Tenn. Crim. App. 1984).  We believe the trial court was acting within that discretion by inquiring of counsel's motives in continuing to ask the question of each witness.

19

The defendant also claims the trial court's questions and statements deprived him of his right of confrontation. The Sixth Amendment of the United States Constitution, applicable to the states through the Fourteenth Amendment, provides that an accused has the right to be confronted with the witnesses against him. U.S. Const. amends. VI, XIV; Pointer v. Texas, 380 U.S. 400, 403, 85 S. Ct. 1065, 1068 (1965). The right of confrontation provides two protections -- the right to face physically the state's witnesses and the right to cross-examine them. See, e.g., State v. Middlebrooks, 840 S.W.2d 317, 332 (Tenn. 1992) (citing Pennsylvania v. Ritchie, 480 U.S. 39, 51, 107 S. Ct. 989, 998 (1987)). We do not see how the trial court's inquiries limited the defendant's cross-examination of the witness. The court ruled that defense counsel could ask whether the witness was going to testify about gunshot residue if defense counsel was going to pursue that line of questioning, although if defense counsel did not intend to ask questions of the witness in this vein, he should move on. Defense counsel said that he asked the question because he wanted to question the witness "about the firing of the gun in the car." Thus, the court's ruling would have allowed defense counsel to pursue this line of questioning, yet defense counsel abandoned it and asked the witness about his drug use.

We fail to see merit in this issue.

**VI**

The defendant also takes issue with the unusual procedure employed by the trial court in placing one of the state's witnesses in custody to review her previous statements after the witness testified she could not remember the events that were the subject of her previous statements. The witness in question, Katherine Blackwell, testified first as a state's witness. She essentially claimed total memory loss of pertinent events as she had previously described in statements

20

given to the T.B.I. and a defense investigator. The court allowed the prosecution to treat Blackwell as a hostile witness. After Blackwell completed her testimony, the court had the jury removed from the courtroom, then sua sponte advised Blackwell,

> I'm going to let you go into the custody of the Sheriff and see if your memory gets any better. For purposes of this record, I don't find the fact that you say you don't remember to be credible. . . . And so, you go with the Sheriff, and when you feel like that you can remember and you can come back in here and testify truthfully before this jury, you can let me know. Until then you can remain in the custody of the Sheriff.

Thereafter, Special Agent Bryan Byrd testified for the state. During the course of his investigation, he took two signed statements from Blackwell. He read both of these statements to the jury. In them, Blackwell claimed that she saw the defendant and the victim together around 1:00 on the morning of the murder at the location where the murder later took place. Around 2:00 that morning, the defendant and another man came to the house where Blackwell and Sheila Bernil were living. The defendant was angry. Several hours later, Blackwell went to buy crack cocaine from the defendant. He was driving a car like one she had previously seen the victim driving. The defendant told her that the victim was dead.

After the state rested, the court allowed the state to reopen its proof, and the court called Blackwell as its own witness. The court explained to the jury, "I'm calling her as my own witness. Neither side will have to vouch for her credibility, but I asked her to take her statements and go back and -- and try to remember what happened and see if her memory improved any." He then addressed the witness, "Now, what I want you to do is I want you to tell these ladies and gentlemen in your own words what happened that night, and . . . I want you to tell them the truth, whatever that is . . . ." Blackwell then proceeded to testify in accord with her previous statements. She said her memory had improved in the

21

hours since her first appearance on the witness stand because she did not want to go to jail. Blackwell also testified that she had been beaten by three unknown assailants shortly after she talked to the T.B.I. She said she did not know why the beating occurred, but she could think of no reason other than her involvement in this case. She admitted, however, that she had not received any threats relative to this case.

At the conclusion of Blackwell's testimony, the defense made a motion to strike the testimony because the witness was coerced by her fear of incarceration to testify in accord with her previous statements. The trial court overruled the motion.

In Tennessee, a trial court has the discretion to call its own witnesses, but that discretion must be exercised carefully and cautiously so that it does not amount to a comment on the evidence. Montesi v. State, 220 Tenn. 354, 370, 417 S.W.2d 554, 561 (1967); see Tenn. Const. art. VI, § 9. The trial court should exercise its discretion only where doing so will further the interests of justice. Montesi, 220 Tenn. at 370, 417 S.W.2d at 561. The proper procedure in such a case is for the trial court to examine the witness, then allow the parties to cross-examine her. Montesi, 220 Tenn. at 370, 417 S.W.2d at 561.

The Rules of Evidence provide methods for addressing situations in which a witness is uncooperative. As was done in this case, the court may, upon request of the party who called the witness, declare the witness hostile, thereby giving the examining party the ability to employ leading questions. Tenn. R. Evid. 611(c). In the event a witness claims memory loss, the witness's prior inconsistent statements are admissible for impeachment purposes under Tennessee Rule of Evidence 613(b). See, e.g., State v. Kendricks, 947 S.W.2d 875, 882 (Tenn. 1996)

22

(witness's prior statement about relevant events admissible as prior inconsistent statement where witness at trial claimed to have no memory of events). Further, a memorandum or other record about matters of which a witness once had knowledge but is unable to recollect sufficiently to testify fully and accurately at trial may be admitted if it meets certain qualifications. Tenn. R. Evid. 803(5).

Further, a trial court may admonish a witness suspected of untruthfulness of the significance of lying under oath. State v. Schafer, 973 S.W.2d 269, 278 (Tenn. Crim. App. 1997). However, a trial court may not declare its belief the witness is being untruthful and threaten the witness with prosecution for perjury to such a degree that the witness changes his testimony to the detriment of the defendant. Schafer, 973 S.W.2d at 278. When the trial court's actions exceed the bounds of an appropriate warning, "the defendant's right to a fair trial is compromised and the outcome of the trial brought into question." Schafer, 973 S.W.2d at 278.

In the present case, the trial court's unusual procedure influenced the witness's testimony to the defendant's detriment. The trial court told the witness, "Until [you can testify truthfully] you can remain in the custody of the sheriff." Later, during her second visit to the witness stand, the witness testified her memory had improved in the last few hours "[b]ecause I didn't want to go to jail." Furthermore, the witness's testimony once she abandoned her claim of memory loss was probative of the defendant's guilt. Her testimony placed the defendant with the victim around 1:00 a.m. on the night of the murder. About an hour later, the defendant and another man came to the house where the witness was living and argued with the witness's roommate about whether the men could come inside. This evidence is significant because it is contrary to the defendant's statement to the police the he was not in Brownsville on the night of the murder. Blackwell also

23

testified that she saw the defendant several hours later, and he told her about the victim's death. This was prior to the discovery of the victim's body. Further, the witness testified she had been assaulted after talking to the T.B.I. and offered the possibility of a causal connection between the two events. Clearly, the trial court's actions influenced testimony which was damaging to the defense. We are constrained to find abuse of discretion in the actions of the trial court.

Moreover, we believe this error mandates reversal.[15] See Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(b); Schafer, 973 S.W.2d at 278. First, the trial court's actions resulted in serious prejudice to the defendant. When Blackwell returned to the witness stand, her testimony was not merely duplicative of evidence already before the jury via Special Agent Byrd.[16] Rather, she made an additional

---

[15]To the extent that the defendant failed to make a contemporaneous objection to the trial court's having Blackwell held in custody and to her testimony that she had been beaten up after talking to the T.B.I., we find that the error affected the integrity of the trial to such a degree that the failure to object should not operate as a waiver of the issue. See Tenn. R. Crim. P. 52(b) (plain error); accord State v. Eaves, 959 S.W.2d 601, 604-05 (Tenn. Crim. App. 1997) (trial court's remarks to witness in presence of jury which amounted to questioning of witness's credibility formed basis for reversal even in absence of contemporaneous objection).

[16]We have mentioned above that T.B.I. Agent Byrd, a state witness, read to the jury the written pretrial statements wherein Blackwell described her early-morning encounters with the defendant. This account helped to establish the defendant's presence in Brownsville at the time of the murder. The evidentiary rationale for admitting these statements was not clear, but the defendant has not claimed that the use of the statements was error. Out of curiosity, we have examined the admission into evidence of Blackwell's extrajudicial statements.

The method of presenting this evidence--via a second state witness--suggested that the state may have been trying to impeach Blackwell's testimony through the use of a prior inconsistent statement. See Tenn. R. Evid. 613. However, if this was the strategy, the state did not explain it as such to the court. Nor did the court instruct the jury that the evidence could be used only for impeachment purposes. Therefore, the statements in fact came in as substantive evidence to prove the truth of the matter asserted, that is, that the defendant was in the locality in the early morning hours of April 20, 1995, and that he knew of the victim's death before the discovery of the body.

As such, we have reviewed our rules of evidence to determine whether the statements are admissible under some exception to the hearsay rule. See

24

extremely damaging claim that she had been assaulted and that the assault might be attributable to the defendant. Moreover, her initial reluctance to testify which was overcome only by the prospect of incarceration was played out before the jury. Unquestionably in these circumstances the testimony upon the witness's second trip to the stand suggest that she had been previously coerced not to testify against the defendant. Second, the entire procedure was prejudicial to the judicial process. Tenn. R. App. P. 36(b) (judgment shall be set aside if it "would result in prejudice to the judicial process"); Tenn. R. App. P. 52(b) (plain error may be noticed "where necessary to do substantial justice").

---

Tenn. R. Evid. 802, 803. The only exception which conceivably applies is the exception for the use of a recorded recollection. See Tenn. R. Evid. 803(5); State v. Basil Mathis, No. 01C01-9605-CC-00186, slip op. at 6 (Tenn. Crim. App., Nashville, May 30, 1997), perm. app. denied (Tenn. 1998). Under rule 803(5), "[a] memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately" is admissible as substantive evidence if the memorandum can be "shown to have been made or adopted by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly." If admitted, such a memorandum may be "read into evidence but may not itself be received as an exhibit unless offered by an adverse party." The Advisory Commission Comments to rule 803(5) say, "The safeguard is the requirement of adoption at the time when the witness could vouch for the document's correctness." (Emphasis added.) There is some basis in the record for applying the exception. In her testimony Blackwell admitted that she gave a statement to the T.B.I. and that, at the time such a statement was given, she would have told the truth. Blackwell testified that she did not remember many of the events that were described in the pretrial statements. The officer's testimony established the statement was made or adopted by the witness at the time the statements were put in writing, a time when the events were fresher in the witness's memory. On the other hand, the witness did not acknowledge at trial that the written statements possessed by Byrd were her statements. Had the issue been raised, we cannot be certain the admission of the statements as substantive evidence would have been approved on appeal.

Nevertheless, we are not constrained in this case to consider the matter further. We have concluded that the conviction should be reversed because of the treatment and use of the witness Blackwell. Assuming that her pretrial statements were properly before the jury as substantive evidence, the error committed by incarcerating and then recalling her as a witness is still egregious enough to warrant reversal and a new trial. Such an error would only be exacerbated were we to find that the witness's story should not have been presented to the jury prior to her second appearance on the stand.

25

As a result, we must reverse the defendant's conviction and remand for a new trial.

## VII

Finally, the defendant advocates that the cumulative effect of the alleged errors has prejudiced him and compromised the judicial process. Because we have found that the defendant is entitled to a new trial, consideration of this issue is not necessary.

The judgment of the trial court is reversed and the case is remanded for a new trial consistent with this opinion.

_____
JAMES CURWOOD WITT, JR., JUDGE


CONCUR:


_____
JOE G. RILEY, JUDGE


_____
ROBERT W. WEDEMEYER, SPECIAL JUDGE