LON CHANEY BOYD, Plaintiff in Error, v. STATE
OF TENNESSEE, Defendant in Error.
—475 S.W.2d 213.

August 20, 1971.

Certiorari Denied by Supreme Court January 3, 1972.

George H. Churchill, Frank J. Glankler, Jr., G. Edward Draper, Memphis, for plaintiff in error.

David M. Pack, Attorney General, Robert H. Roberts, Sam J. Catanzaro, Jr., Billy F. Gray, Assistant Attorneys General, Memphis, for defendant in error.

O'BRIEN, J.   This appeal comes from the Criminal Court of Shelby County, Tennessee. Plaintiff in error was indicted for the offense of 1st Degree Murder and convicted of Involuntary Manslaughter by a jury. Punishment was fixed at one day in the County Jail. Plaintiff in error will be referred to by name, or as appellant.

On October 5th, 1967, Lon Chaney Boyd was a patrolman on the Memphis Police Department, assigned to the Detention Division and employed as a turnkey on the 5th floor of the Memphis City jail. On that date, one Morgan (Morge) Scott was arrested on a drunkenness charge by the City of Memphis Police and transported to the City jail at approximately 3:00 o'clock P. M. Patrolman Boyd had just started working an eight hour shift when the series of events began, resulting in the death of Morgan Scott, and the conviction of appellant.

It appears that Morgan Scott was arrested for public drunkenness at the rear of the Memphis Union Mission, which was only a few blocks distant from the Police Station in the City of Memphis. While disembarking from the police patrol car in the basement of the Police Station, Scott, in his drunken condition, fell, striking his nose on the door of the car, scraping the outer surface of his nose, and causing some internal nose bleeding. There is some evidence in the record that his nose might have been broken. He was taken to the 2nd floor of the jail, searched, and then removed to the 5th floor, where he was logged in and incarcerated. The evidence

indicates he was in an advanced state of drunkenness, although still ambulatory. He exhibited a degree of belligerency because of his arrest, in conjunction with which he expressed himself in a somewhat profane manner toward several of the police officers. There is evidence that during the administrative procedure leading to his confinement, Scott was struck by appellant for his refusal to cooperate, and because of his belligerent attitude. At approximately 3:00 P.M. he was placed in solitary confinement in what is commonly referred to as a "dry cell". There is testimony in the record to the effect that he was observed, within the cell, by various members of the police department, including appellant, during the course of the next eight hours. At approximately 12:30 A.M., the following morning, he was found dead in the cell. An autopsy disclosed that the cause of death was internal bleeding into the abdominal cavity, due to a torn liver.

■ We find eleven assignments of error. Nos. I, II, III, IV, and VIII contend that the evidence preponderates against the verdict, and attacks the weight and sufficiency of the evidence.

The record in this case is voluminous, however, the facts appear to be clear. Officers Dunaway and Scarborough testified they found Scott in a drunken condition, lying on a bench in a shed, in the rear of the Memphis Union Mission. Although in an advanced state of drunkenness, he was able to walk under his own power. He was transported to the jail in the rear seat of a patrol car. In endeavoring to climb from the patrol car, which was parked in the basement of the police headquarters, he fell against the open door of the vehicle

and injured his nose, causing it to bleed. Patrolman Scarborough testified he was able to prevent Scott from striking the floor and the only apparent injury which he sustained was the blow to his nose. This was corroborated by Patrolman Dunaway. The incident was reported to the Lieutenant on duty. At this point, no one, including Scott, considered this injury serious enough to require medical attention. Officer Dunaway took Scott to the 2nd floor of the jail in the elevator, accompanied by two other prisoners, and Patrolman Butler, who was the elevator operator. The prisoners were turned over to the detention personnel and the last time he saw Morgan Scott he was alive and well, except for the nose injury.

Patrolman Phillip D. Cook testified he was assigned to searching prisoners on the 2nd floor of the jail on the date in question. That he searched Morgan Scott upon his arrival on the 2nd floor of the jail. Scott's physical condition indicated he was very drunk. His only apparent injury was a slight nose bleed. Scott walked from the elevator to the search area without assistance. He was subjected to a search in the customary manner which required prisoners to raise their hands and hold onto the bars which encompassed the area occupied by the desk lieutenant's office. After the prisoners, including Scott, were searched, they were transported to the 5th floor on the elevator. He did not see Morgan Scott again.

Lieutenant Carroll W. Richards, of the Memphis Police Department, testified he was commanding officer of the 3:00 P.M. to 11:00 P.M. shift in the Detention Bureau on October 5th, 1967. At approximately 3:00 P. M. on that date, three or four prisoners were checked in at his

station on the 2nd floor of the jail. He identified Scott as one of the prisoners, who was cursing in a belligerent manner and who had sustained an injury to his nose. Upon inquiry, he was informed by the officer who brought Scott in that he had stumbled, causing the injury. After the prisoners were transported to the 5th floor, he was informed by one of the turnkeys that Scott had been placed in the dry cell. In the course of his tour of duty, he checked the cell block about 4:30 or 5:00 P.M., and again about 9:00 or 9:30, at which time he observed Scott in the dry cell, and he appeared to be sleeping.

Officer Thomas L. Butler testified he was employed in the Detention Division on October 5th, 1967, on the 3:00 P.M. to 11:00 P.M. shift. His duties included assisting on the 2nd and 5th floors, and operating the elevator. In the course of this work he transported Morgan Scott up to the 5th floor at 3:00 or a little later. There was at least one other male, white prisoner, and possibly two others. Scott's conduct was abusive in that he was cursing the police department and one of the prisoners on the elevator with him. Butler left the prisoners in the charge of Officer Boyd and returned to the elevator to answer another call. While transporting Scott in the elevator, Butler observed blood smears on the bridge of Scott's nose, and just above the upper lip. After leaving Scott and the other prisoners in the custody of Officer Boyd, Butler then transported a prisoner to the 2nd floor to be searched and processed, prior to being taken to the 5th floor. Butler arrived back on the 5th floor about ten or fifteen minutes after 3:00. When he arrived on the 5th floor, he observed Officer Boyd dragging Morgan Scott down a corridor toward the east wing. He followed Boyd

down to the dry cell behind the prisoner. At this point, we consider it essential to quote Butler verbatim from the record: "When we got to the dry cell, Officer Boyd asked the subject to take off his shoes, remove his shoes. He did not say anything, and he uttered incoherently, as a drunk will. Officer Boyd removed his shoes and reached under and to his side and took him by the belt of the pants and lifted him up and then placed him in the dry cell and closed the door." Butler's further testimony was that Boyd stated to him that after he had gone from the floor Boyd attempted to get the information necessary to complete the information in the jail book. That Scott gave Boyd verbal abuse, cussed him out and told him he didn't have any right to ask him any questions, that he refused to answer them and he backed against the wall and sat down. Officer Boyd told him to get up, so he could go to his cell, and he refused to do so, and Mr. Boyd went around to get the male white and stated at that time the male white attempted to strike him and kicked at him, and that's when Boyd reached down and grabbed him by the legs and started pulling him around to the dry cell. That when he, Butler, returned Scott was conscious and mumbling incoherently. That he did not assist Boyd in placing Scott inside the dry cell. While this procedure was going on, he left the prisoner whom he had transported to the 5th floor standing against the wall in the area of the admission desk. He did not recall if there were any other prisoners in front of the desk at that time. He reported to Boyd that the prisoner he had just brought up was a juvenile who should be placed in a cell by himself, and to the best of his recollection, left the floor. About 3:30 he returned to the 5th floor and at that time he checked the dry cell by looking through the

window. The prisoner, Scott, was lying on his stomach, with his head toward the door, and apparently asleep. On cross-examination he testified there was nothing unusual in the manner used by Boyd in dragging the prisoner, Scott, when one would be in the condition, or conducting himself as Scott was. He did not see Boyd abuse Scott in any manner. That when he checked the dry cell between 3:30 and 4:00, he observed nothing about Scott's condition which caused him any alarm.

Price Taylor was a prisoner being detained on the 5th floor pending payment of a traffic fine. The state's brief refers to him as a young man, however, the record discloses he was sixty-six years of age. Exhibit No. 29 to the record indicates he was logged in at 3:00 P.M. and was authorized to use the telephone at that hour. He testified while he was using the phone, prisoners on the floor were instructed to stand up by the side of the wall, but one white fellow squatted down and refused to stand when directed to do so by the officer, that he cursed the officer, who, after directing him again to stand up, struck him. He first indicated the blow was struck somewhere around the area of the stomach. He further indicated that a second blow was struck somewhere about the back of the neck, after which the officer took the prisoner by the legs and dragged him away somewhere, he did not see the prisoner hit or kick the officer. He did not see any other officers present during the time that this incident occurred. He observed the officer hit the prisoner with his fist, somewhere in the region of his chest or stomach. He hit him in the front first, and then he hit him in the back. He did not observe any blood on the face of the prisoner who was struck.

Walter Lee Nelson testified he was arrested for drunk on October 5th, 1967. Exhibit 29 to the record indicates he was logged in at 9:35 A.M. on that date and transported to the hospital at 11:20 A.M. He returned from the hospital at 3:00 o'clock P.M. He states when he was returned to the jail, there were other prisoners who accompanied him on the elevator to what he refers to as his regular floor. He noticed one man with his nose bleeding. He identified the plaintiff in error as the officer who was working on that floor. He and the other prisoners were standing against the wall when the prisoner with the nose bleed refused to give his name to the officer and started cussing. That the officer came from behind the desk and struck the prisoner. Only one blow was struck to his knowledge. The officer then dragged the prisoner around the corner. He heard the prisoner say, "You can hit me, so and so and so." He testified that he had a severe epileptic problem and took large doses of Dilantin and Phenobarbital, which was prescribed for him at John Gaston Hospital. That he followed his prescription according to directions. He had been arrested "for drunk" too frequently to count the times. He took both a dilatin and a phenobarbital at about 3:15 P.M., before his testimony, on the trial date.

George Wainright testified he was employed by the Memphis Police Department as a porter. That on October 5th, 1967, he was employed on the 3:00 P.M. to 11:00 P.M. shift. On that day he went to the 5th floor about 3:00 P.M. He identified plaintiff in error as the officer who was on duty on the 5th floor on that date. The witness testified he was on the 5th floor when the prisoners came up. When Officer Boyd asked all of them their

696

names, Scott gave Boyd some trouble. He was cursing and swung at Boyd twice when he was asked his name. At that time Boyd was behind the counter and Scott was standing up by the counter. He believed there was a total of four prisoners present. Boyd had come around from behind the counter when Scott kicked at him.

At this point the witness became extremely emotional, but continued with his testimony regarding the facts surrounding the incident, stating that when Scott came in, his nose and mouth and shirt were bloody. He stated that Boyd had not hit Scott, apparently denying a statement he had previously made to police officers. He stated they had exerted a great deal of pressure on him to make the previous statement, keeping him under interrogation from 6:00 P.M. in the evening until approximately 5:00 A.M. the next morning, using threats of great violence in forcing a statement from him. At this point the jury was excused at the request of the State and a request was made for permission to cross-examine the witness. This was allowed by the court over the objection of defense counsel, and after the jury returned, the next twenty-five pages in the Bill of Exceptions are devoted to cross-examination by the attorney general regarding a statement which this witness had previously made to officers of the Memphis Police Department on October 9th, 1967. The gist of this cross-examination, in substance, was to the effect that in the prior statement he informed the officers he had observed the prisoner, Morge Scott, being hit in the stomach by Officer Boyd on the date in question. That Scott had been cursing Boyd and had kicked at him twice and swung at him. These incidents took place by the clock in the 5th floor detention room.

Boyd struck Scott one time. The others present at the time were the white prisoner who came up on the elevator with Scott, also a colored man who came up on the elevator, and Patrolman Butler. That Boyd struck Scott with his fist. Scott doubled up but did not hit the floor. Patrolman Butler observed Boyd striking Scott. The prisoners were standing against the wall under the clock in front of the desk when the blow was struck. No one else struck Morge Scott in his presence. The first time he saw Scott was when they brought him in to be booked. Officers Cook and Butler brought in the prisoners. Officer Boyd was behind the desk. Officer Butler stayed and Officer Cook went back downstairs. Boyd was recording the prisoners names on the book. Scott refused to give his name and began cursing. Boyd came from around behind the desk and the man, Scott, got up and started calling Boyd names. He kicked at Boyd with his foot twice and Boyd hit him in the stomach with his fist. Boyd picked him up by his belt and took him around the desk and down the hall. Mr. Butler was helping Boyd take him down the hall. Butler took the man's shoes off, and Boyd laid him down on the floor and dragged him into the cell by his belt. Butler didn't go into the cell. Afterward, Boyd said, "I have got to go back and see how the man is doing in the dry cell." He saw Boyd looking through the window of the dry cell. He was mopping and went where he could see down the hall where the dry cell was. Boyd didn't open the door and he didn't hear him say anything. Boyd came back up the hall. It wasn't long before he went back there again. Wainright watched him from the same place. He looked through the cell window, and he came back by the door and he said, "He is still breathing, George." And he sat down back

behind the desk. He said, " We have got the air on, and he will be sober after awhile." About 9:00 o'clock Wainright went to the 2nd floor and returned about 30 or 40 minutes later. Boyd told him to go back and see how the man was doing in the dry cell. He went back there and looked through the window and the man was lying on the floor with his feet towards the door and his back toward the bunk, and looked like he was breathing because his stomach was going up and down. He came on back to the desk and told Boyd he was breathing and Boyd said, "That is all right." It wasn't long after that, about a half hour, that he saw Butler go back there with a walking stick. He didn't see him go to the dry cell, but he knew he went down the hall at least to the dry cell, was gone about 15 minutes and came up by the desk and sat down. It might have been a half hour after Butler came back when his relief came. The next time he heard anything about Morge Scott, was the next day at 2:30 P.M., after he had reported to work and went to the 5th floor. Ed McKay said to Boyd: "Do you all know that you left a man to be died up here?" Boyd said, "I put it on the book and told you all he was in there." McKay told me, "You all ought to have took him out," and I said, "That ain't my job." I said, "I am a porter." Saturday he came to work at 2:30 P.M. and later on in the evening he knew Mr. Cook and Mr. Butler had been up in internal security the day before, and Boyd said they were trying to put something on him about the man dying, and then Lieutenant Hutchins called him over the radio to come downstairs and that is when Boyd said, "Don't you tell them about me hitting the man." Both times that Boyd went back to the dry cell to look at Morge Scott, he said, "Well, George, he still ain't moved

but he is still breathing." When the cook came to feed the prisoners on October 5th, he told him not to feed Morge Scott because he was drunk and raising a whole lot of sand and Boyd had hit him.

The direct examination of the witness, George Wainright, then was resumed and he testified that on the date the statement was given, the detectives had come to his home at 6:00 o'clock in the evening and held him until 4:00 o'clock the next morning. That he did not know who the officers were. At this point the court admonished jury as follows: *"Before we get too far, gentlemen of the jury, do not consider the questions and answers of that statement to go to the guilt or innocence of the defendant now on trial. The only purpose that you can use the statements—the questions and answers that were asked by Mr. Catanzaro there, that Captain Cochran was alleged to have asked, and the answers given by this defendant, are to go to the credibility of this witness here. It cannot be used as to the guilt or innocence of the defendant on trial. Does everybody understand that?"* Whereupon an affirmative response was given by the jury.) George Wainright testified further that he had signed the statement, that the statement was true. That the officers came and got him at 6:00 o'clock and kept him until 4:00 o'clock the next morning. That the statement was given under great duress, that the officers had threatened him with bodily harm and that they would keep him in jail forever, although they actually did not harm him in any way. He then reiterated that the statement was a true and correct statement although he was forced to make it. After which he stated unequivocally on the witness stand, that he did not see Boyd strike

Morge Scott in the stomach. The statement he had given Captain Cochran was false, his present testimony was true. That the statement was forced out of him.

Patrolman James S. Coop testified that he relieved Boyd and Butler at about 10:50 P.M. At 12:30 A.M. he and Officer Young went to cell 8E to get out a prisoner, Morgan Scott. They found him lying on the floor with his head pointing toward the rear of the cell, his feet toward the door, and his head and left shoulder were partially under the jail bench. They tried to arouse the prisoner and he appeared to be dead. Coop checked for a pulse and couldn't find one. They were going to remove the prisoner from the cell for the purpose of allowing him to use the telephone if he wished to do so, and in compliance with their instructions not to leave a prisoner in that cell, in a dry cell for any lengthy period. The prisoner was lying on his stomach, hands beside him, palm up. The air conditioning was on in the cell and the temperature was cold. The body was cold.

The brief on behalf of defendant cites numerous authorities, including Line v. State, 191 Tenn. 380, 234 S.W.2d 818, to the effect that a new trial will be granted when the evidence preponderates against the verdict. This is a correct statement of the law, however, in the *Line* case, supra, there was no evidence to support the verdict. In Leake v. State, 29 Tenn. 144, relied upon by defendant, it was said:

"In criminal cases, the Supreme Court will weigh the evidence, and, if it preponderates against the verdict, will grant a new trial, but the verdict must always have great weight with a revising court, and throws

the burden on the defendant to show that the weight of evidence is in favor of his innocence, whereas previously the presumption was in favor of innocence."

Further, the conviction in *Leake,* supra, was for 2nd Degree Murder, and turned on a question of malice, which is not present in the conviction in this case.

Messer v. State, 215 Tenn. 248, 385 S.W.2d 98, is correctly quoted in the brief for defendant to the effect that "if trial court is of opinion that verdict of conviction is not sustained by evidence, only course is to grant new trial." We find nothing in this record to indicate that the trial judge, functioning as a thirteenth juror, was not in accord with the verdict of conviction.

The citation from Major v. State, 36 Tenn. 597, cited by defendant, while a correct statement of law, is from the head notes and is not to be found in the text of that case. The case was reversed and remanded on the premise that the trial court should have granted a change of venue to some other county where an impartial jury could be impaneled.

Defendant cites Whiteside v. State, 44 Tenn. 175. We find no facts or circumstances in *Whiteside* corresponding with the instant case.

In Manning v. State, 155 Tenn. 266, 292 S.W. 451, the judgment of the trial court was affirmed under facts and circumstances with which we cannot find any great dissimilarity in the case before us.

The decision in State v. Ferguson, 165 Tenn. 61, 52 S.W.2d 140, turned on the question of procedure in the

trial court and is applicable to neither the facts nor the law in this case.

Montesi v. State, 220 Tenn. 354, 417 S.W.2d 554, is cited in defendant's brief. We do not find the cited statement of law quoted in the printed text of the reference case.

The evidence in this case has presented clear cut issues for the jury, which has decided them against the defendant. The rules and authorities governing appellate review in this state are so definite and well known, they must be categorized under the doctrine of Stare Decisis, to be adhered to as established law in the sound administration of justice. Although there have been more recent expositions of these rules (see Maxwell v. State, Tenn.Cr. App., 441 S.W.2d 503; Edmaiston v. State, Tenn.Cr.App., 452 S.W.2d 677; Taylor v. State, Tenn.Cr.App., 455 S.W.2d 168; O'Neil v. State, Tenn.Cr.App., 455 S.W.2d 597; Prock v. State, Tenn.Cr.App., 455 S.W.2d 658; Vaughn v. State, 3 Tenn.Cr. App. 54, 456 S.W.2d 379; Crumsey v. State, 3 Tenn.Cr.App. 285, 460 S.W.2d 858), a full statement is made in Bolin v. State, 219 Tenn. 4, 405 S.W.2d 768, which we quote as follows:

"We must view this contention in the light of the well-settled rule in this State that the verdict of the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State. Such verdict also removes the presumption of innocence, raises the presumption of guilt and puts upon the defendant the burden of showing that the evidence preponderates against the verdict. Cooper v. State, 123 Tenn. 37,

138 S.W. 826; McBee v. State, 213 Tenn. 15, 372 S.W.2d 173.

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmos-.phere and the totality of the evidence cannot be reproduced with a written record in this Court. Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523.

The defendant in the case at bar has not overcome the aforementioned presumption of guilty raised by the verdict of the jury against him. Belief or disbelief of the victim is a decision which is within the jury's exclusive province, and it is obvious from their verdict that they believe the victim and not the defendant. At this appellate level we must adopt this evaluation of credibility as our own in accordance with established and well founded rules of trial and appellate practice.''

The foregoing statement is equally applicable to the jury's belief or disbelief of the witnesses and other evidence presented.

In the final analysis, it was simply a question of credibility of the respective witnesses and the verdict of the jury settles that question so far as this court is concerned. Assignments of Error I, II, III, IV and VIII are overruled.

■ Assignments No. V, VI, and XI, contend that the court erred in allowing the verdict to stand because the verdict of the jury was against the will of the majority, and was the result of a compromise of the issue of reasonable doubt.

We have examined the authorities submitted by the defense and by the State on this point and find them of little assistance.

Insofar as the affidavits of the jurors are concerned the trial judge did consider them in overruling the motion for new trial. The court fully instructed the jury in his charge regarding the duty of each individual juror in returning his own verdict, and consideration of the opinion of the other jurors in returning a verdict. Further, when the jury returned from the jury room with their verdict, the court addressed each individual juror in the case, and asked them if they had arrived at a verdict in the case, and each juror said that he had arrived at a verdict. After receiving the verdict from the foreman of the jury, the court then turned to each individual juror and asked, "Is that your verdict?" Each juror individually said that it was his verdict. Thereupon the jury was polled upon the request of the attorneys for the defendant and each individual juror stated his name and stated that was his verdict.

It is not necessary in every case that the court even accept affidavits of jurors which would tend to impeach their verdict. In Act-O-Lane Gas Service Company v. Clinton, 35 Tenn.App. 442, 245 S.W.2d 795, it was said:

"By their affidavits the two jurors endeavored to impeach their verdict. Except in rare instances such attempts are futile. It is the general rule that jurors will not be permitted to impeach their verdict and to stultify themselves by later making affidavits, the substance of which shows that they did not fairly try the case they had taken oath to do. Wade v. Ordway, 60 Tenn. 229; Dunnaway v. State, 62 Tenn. 206; Harbin v. Elam, 1 Tenn.App. 496; Tennessee Eastern Electric Co. v. Link, 6 Tenn.App. 617; Williamson v. Howell, 13 Tenn.App. 506; Fidelity Bond & Mortgage Co. v. American Surety Co., 14 Tenn.App. 211; Colonial Baking Co. v. Acquino, 20 Tenn.App. 692, 103 S.W.2d 613; McAlester v. Monteverde, 22 Tenn.App. 14, 113 S.W.2d 257; Lee v. State, 121 Tenn. 521, 554, 116 S.W. 881; Walter v. Skeleton, 31 Tenn.App. 103, 212 S.W.2d 690, 698."

The law which correctly applies to the instant case was fully stated in Lee v. State, 121 Tenn. 521, 116 S.W. 890, where the Supreme Court said, "We have in this state three lines of cases upon the subject of admitting the affidavits of jurors to impeach the verdict. . . ."

"The third line of cases embraces those wherein it was sought to impeach verdicts by showing the erroneous reasons or grounds which actuated or controlled the jury in arriving at their verdict. (Citing cases.)

The substance of this last line of decision is sufficiently stated in the following excerpt, which we make from Lewis v. Moses, *supra* (46 Tenn. 193). In that case the court say: (sic)

'In the case of Harvey v. Jones 3 Humph., [157], 159, it is said: "This court has repeatedly had occasion to comment upon the danger of setting aside verdicts upon the affidavits of jurors, and to declare that it will be done only in extraordinary cases, and then with great caution." '

. . . If this rule were adopted, but few verdicts would be permitted to stand. Jurors may arrive at the same conclusion, and render the same verdict, but the influences that control their minds, and the process of reasoning by which they arrive at their conclusion, are as diverse as the human mind itself; and the argument and reasons governing each juror in rendering his verdict might not always be found the most logical, or in accordance with the views of the court. If no error of law was committed, if the jury were guilty of no misconduct, if the verdict they render is supported by the evidence, this court could not set it aside upon the affidavit of a juror that he reached this result by erroneous reasoning, or from considerations that should not have influenced him, but will presume that the results arrived at was the legitimate result of the law and the facts.

We think the affidavit in the present case falls within the last line of authorities, as the substance of these cases is expressed in the opinion just quoted from. The affidavit undertook to state merely the method by which the jury arrived at their conclusion, or the reason upon which they reached the result. The reason given, it is true, was an erroneous one, and involved a matter which they had no right to consider; but within the rule as above laid down, when the court can see that

the verdict is sustained by the evidence which was submitted to the jury, and that it is in accordance with the law, we cannot reverse because the jury reached the true result of erroneous grounds and entertained considerations which they had no right to indulge." Lee v. State, *supra*, quoting Norris v. State, 3 Humph. 333, 39 Am.Dec. 175.

The verdict in this case is sustained by the evidence, and is in accordance with the law, and the assignments of error must be overruled.

■ Assignment of error No. VII charges the court with error in failing to charge the jury that they had no right to compromise the issue of reasonable doubt.

The court charged, as the law requires, each of the 4 degrees of homicide included in the offense of Murder in the 1st Degree for which appellant was indicted. After stating the punishment for each of the various degrees of homicide, the court then stressed to the jury that if they found the defendant guilty of any one of the degrees of homicide they must do so from the evidence, beyond a reasonable doubt. The charge contained a complete, and comprehensive exposition of the law regarding reasonable doubt which fully met all requirements. No request for further instructions was made by counsel for the defense (T.C.A. Sec. 40-2517), and we find the assignment without merit.

■ Assignment of error No. IX complains of the court's refusal to allow the jury to view the city jail to get an accurate idea of the area of the alleged crime. This assignment is not argued.

This is a matter which reposes in the sound discretion of the trial judge. The record includes numerous exhibits which, without disputation, accurately portray the interior of the jail. We find nothing to indicate that the trial judge abused his discretion in refusing this request and the assignment of error is overruled.

Assignment No. X is premised on the alleged error of the trial court in charging the jury on Murder in the 1st Degree contrary to the evidence. Neither the defense nor the State have cited adequate authority on this question which we find properly stated in Poole v. State, 61 Tenn. 288, at p. 294:

"It is also the duty of the Court to define in his charge all the offenses embraced in an indictment for this crime. The jury is the exclusive judge of the facts, the Court is a witness to it of the law. When the jury has heard the facts, it is for it to say what offense, if any, has been committed against the law. However plain it may be to the mind of the Court that one certain offense has been committed and none other, he must not confine himself in his charge to that offense. When he does so he invades the province of the jury, whose peculiar duty it is to ascertain the grade of offense. However clear it may be, the Court should never decide the facts, but must leave them unembarrassed to the jury.

The rule that a Court is only required to charge as to such questions as are made by the facts, means simply that if legal questions present themselves by the facts, and which are claimed either to sustain or refute the charges in the indictment, then it is the duty

of the Court to charge upon such questions, but if questions not so raised are urged, it is not the duty of the Court to charge touching them. It was never meant that the Court should be excused from defining the offenses averred or embraced in the indictment.''

We cannot find error in this case and the judgment of the trial court is affirmed.

Mitchell and Russell, JJ., concur.