# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs December 4, 2013

## STATE OF TENNESSEE v. DWAYNE WRIGHT

**Direct Appeal from the Criminal Court for Shelby County**
**No. 11-05626      W. Mark Ward, Judge**

**No. W2013-00433-CCA-R3-CD  -  Filed March 21, 2014**

The defendant, Dwayne Wright, was convicted of one count of aggravated rape, a Class A felony, and sentenced to twenty-four years in the Department of Correction.  On appeal, he raises five issues for our review: (1) whether the evidence is sufficient to support the conviction; (2) whether the trial court properly denied the defendant's motion for the jury to visit the crime scene; (3) whether the trial court properly allowed the victim to testify regarding prior sexual abuse; (4) whether the trial court properly ruled that the victim's statements were admissible under the excited utterance hearsay exception; and (5) whether the sentence imposed is proper.  Following review of the record, we affirm the judgment and sentence as imposed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JEFFREY S. BIVINS, JJ., joined.

Stephen C. Bush, Shelby County Public Defender; Barry W. Kuhn, Assistant Shelby County Public Defender (on appeal); and C.J. Barnes, Assistant Shelby County Public Defender (at trial), for the appellant, Dwayne Wright.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; Amy Weirich, District Attorney General; and Jennifer Nichols, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

**Procedural History**

The victim testified that on the evening of April 9, 2002, she, her then-boyfriend, now husband, and her friend, Eva Lundahl, had dinner together at the home they shared. The group consumed a couple of bottles of wine with their dinner. At some point during the evening, a friend called Ms. Lundahl, and they made plans to go and sing karoke at Alfred's on Beale Street. The victim decided to join them, but her boyfriend remained home with the victim's child. The group arrived at Alfred's around 10:00 p.m., with the victim wearing black pants, a black shirt, and ankle boots. Underneath her clothes, she wore a bra and pantyhose, but she did not wear panties.

Upon their arrival, the group sat at a table and ordered several alcoholic beverages. More people they knew joined them, and the group continued to drink and began dancing together. No drugs were taken, and no one was seeking to purchase them. Although she had been drinking alcohol, the victim was not intoxicated to the point that she had trouble walking or slurring her words. Ms. Lundahl eventually got onto the stage to sing karoke. Around midnight, the victim proceeded toward the women's restroom. In the area near the restrooms at Alfred's "[t]here's a doorway you walk in [and] the women's bathroom is to the right [and] the men's [bathroom is] to the left." The area was dark and there was "a little hallway [with] a cigarette machine . . . between the" restroom doorways.

As the victim approached the area, she stopped because she believed that the defendant, whom she did not know, seemed to be saying something to her. She could not hear what the defendant was saying, so the victim leaned forward to hear. At that point, the defendant grabbed the victim and pushed her through the door of the men's restroom and into a stall inside the room. The victim was approximately five feet tall and weighed around 115 pounds. The defendant was six feet, four inches tall and weighed approximately 295 pounds.

The victim was forced into the handicap stall with her body facing the toilet, with the defendant remaining behind her. The defendant ripped her pants down, ripping the zipper and a hole in her pantyhose. Although the victim was pleading with the defendant to stop, he continued and penetrated her vagina and anus. The victim felt the defendant's hands on the back of her neck and head, and she "felt him inside of her." At some point, the victim heard someone begin to beat upon the stall door. The victim stopped his assault at that point, and he exited the stall. The crying victim pulled her pants up and saw the man who had banged on the door. The man did not speak but "indicat[ed] a sort of shhh sign with [his] mouth." The victim stopped crying, and the man walked her to the restroom door. The victim did not know this man or where he went after she left the restroom. The victim did recall seeing other men in the restroom when she left.

The victim was shocked and scared and did not seek assistance from anyone regarding the rape at that time. She returned to her table and finished her drink. Ms. Lundahl noted

a change in the victim's mood upon her return from the restroom. Some time later, the victim asked to leave. At the time the group left Alfred's, the victim had not told anyone that she had been raped.

The group proceeded to a coffee shop called The Map Room. The victim sat with the group, listening to their conversation and drinking coffee. She felt numb, frozen, and did not feel like laughing with her friends. The victim also noted that her rectum was hurting. Ms. Lundahl described the victim during this time as "very blank in the face." The victim and Ms. Lundahl at some point went to the restroom together at The Map Room. The victim urinated, wiped herself, and noticed blood on the tissue, as well as on her clothing. The victim began crying and told Ms. Lundahl what had happened to her at Alfred's. Ms. Lundahl suggested that they call the police or call the victim's boyfriend, but the victim refused to talk to anyone at the time.

Early the next morning, the victim and Ms. Lundahl left The Map Room with Ms. Lundahl's ex-boyfriend and his sister. They returned to the victim's and Ms. Lundahl's residence, arriving at approximately 7:00 a.m. The victim's boyfriend had already gotten her child off to school, and he was not happy that the victim had not called to tell him that she was going to be later than expected in coming home. The victim told her boyfriend nothing about the rape, and, after a short discussion, he left for work. Ms. Lundahl and the two other guests had gone upstairs to her room.

The victim laid down on her bed because she was upset. She eventually got up and removed her clothes, leaving them on the bathroom floor, before dressing in sweatpants and a t-shirt. The victim did not shower, as she knew that rape victims were not supposed to shower afterwards. The victim's boyfriend became concerned that something was wrong with the victim while he was at work. Around 1:00 p.m., he returned home and found the victim "curled up in the bed with a blanket pulled over her, just kind of in a ball laying there. . . ." He asked the victim why she had been out so late the previous evening, and she responded that someone had tried, unsuccessfully, to rape her at Alfred's. He went into the bathroom and saw the victim's clothes on the floor, noticing that the zipper of the pants and the pantyhose were ripped. He again asked the victim what had happened, and she told him that she had in fact been raped by an unknown black man at Alfred's.

At this point, the victim still did not want to call the police. Instead she went to her gynecologist. However, the doctor refused to see her as the office was not set up to deal with rape kits. The victim's boyfriend also called a doctor friend to see the victim, but he was told that the victim needed to go to the Rape Crisis Center. Her boyfriend took the victim to the center where she was examined. She provided details about the rape, as well as about past sexual abuse. Specifically, she told the examiner that when she was between ten and twelve,

on multiple occasions, she was sexually abused by her mother's best friend's dad. She recalled that after each instance, she would return to the living room as if nothing had occurred. The victim did not ever ask anyone for help.

During the examination, Nina Sublette, a family nurse practitioner, observed several acute injuries on the victim's anus, one of which was still bleeding. Ms. Sublette believed that the manner of the injury was consistent with the victim's statement that she had been raped. In addition to the bleeding laceration, the victim had two other anal injuries and friction injuries. Ms. Sublette collected evidence from inside and outside of the victim's vagina and anus, which she packed in a rape kit and sent for testing.

Following the examination and collection of evidence, the victim spoke with police at the crisis center. She was unable to identify the defendant or give a detailed description. The victim took the clothes she had been wearing at the time of the rape to the center the following day.

The testing done upon the evidence collected revealed semen and sperm in the vaginal smear and semen in the anal swab. A DNA profile based upon the recovered semen was generated and later uploaded into the Tennessee Bureau of Investigation's ("TBI") CODIS system. Years later, Sergeant Stephen Wilkerson was informed that a match to the profile entered in the victim's rape case had been found. He contacted the victim, who was currently living out of state, and she flew to Tennessee to be interviewed. Sgt. Wilkerson also began seeking the defendant, and, upon locating him, executed a DNA search warrant to obtain a saliva sample from him. The sample was sent to the lab for re-testing to ensure an accurate match. The positive match was confirmed.

In 2011, the defendant was indicted by a Shelby County grand jury for one count of aggravated rape. He proceeded to trial in 2012. Prior to the beginning of the trial, the defendant filed a motion requesting that the jury be allowed to travel to the crime scene at Alfred's in order to see the size and dimensions of the restroom. The State protested, arguing that the trip would not assist the jury's determination and would waste both time and resources. The court denied the motion, but noted that the motion could be reconsidered if the issue became important during the presentation of the evidence.

At trial, the State presented multiple witnesses who testified to the above account of the evening and subsequent investigation. Afterwards, the defendant called Brian Bazar, the general manager of Alfred's. He described the layout of the restaurant, including the area surrounding the restrooms. A diagram of the restaurant and recent pictures were shown to the jury to assist them as Mr. Bazar detailed the layout of the area.

-4-

The only other witness called by the defense was the defendant himself. He did not deny that he had in fact had sexual relations with the victim in the restroom at Alfred's on the night in question. However, he portrayed the act as consensual between the parties. The defendant testified that, at the time, he was employed in the Community Relations Department with the Memphis Redbirds. He further claimed that, after hours, he also worked with several of the players as a bodyguard. He testified that on the night in question, he had gone to Alfred's with ball players, Jason Karnuth and Keith McDonald, as they often did. He stated that around 12:30 p.m., the victim approached him as he was standing at the bar and asked if he knew where she could get cocaine. According to the defendant, he then asked the victim what she would do for the cocaine, and she responded by inviting him to follow her. The defendant maintained that the victim entered the men's restroom, sat on the toilet, and began performing oral sex on him. He claimed that, after he had achieved an erection, the victim pulled down her pants, put one leg on the toilet set, and they had consensual vaginal intercourse. The defendant denied that he had penetrated the victim's anus. The defendant further testified that the victim never said to stop and was, in fact, "moaning in pleasure." He claimed that he ejaculated on the victim's back. The defendant also testified that two of the baseball players he was with that evening saw what occurred in the stall.

Afterwards, in the defendant's version of events, the victim again asked the defendant about the cocaine. He claimed to have told her that he didn't have any and walked out. He testified that he and his group were later standing outside of Alfred's when they were approached by the victim and her friends. He claimed that they demanded that the defendant get cocaine for the victim. The defendant testified that a police officer intervened, and the confrontation ended. He claimed to have never seen the victim again.

In rebuttal, the State called three former Memphis Redbird players to the stand, specifically the ones the defendant claimed were present the night of the rape. Each denied that the defendant had ever served as their bodyguard. The players did acknowledge that they knew the defendant and had occasionally gone out with him, but each adamantly testified that they were not with the defendant on the night in question and had never watched him have sexual intercourse in a restroom at Alfred's. Questioning revealed that two of the players were no longer in Memphis when the crime occurred.

After hearing the evidence presented, the defendant was convicted as charged. A pre-sentence report was prepared and introduced as an exhibit at the subsequent sentencing hearing. The court determined that the defendant's sentencing range, as a Range I offender, was fifteen to twenty-five years for his Class A felony conviction.

The victim testified at the sentencing hearing and stated that she still suffers from

depression and anxiety which affects her ability to perform her normal activities. She also testified that she suffered from nightmares as well. While acknowledging that counseling and time had improved her situation, she testified she did still suffer trauma from the rape.

The defendant called his mother and brother to the stand. Each testified that the defendant lived with his mother prior to his arrest and that he had worked as a bodyguard. Each also related that the defendant suffered greatly with arthritis and gout. They both stated that they believed that the defendant was innocent of the crime. They, along with two other witnesses called, testified that this act was not in the defendant's nature and characterized him as a "protector" of women.

The trial court found two enhancement factors applicable. Based upon the defendant's thirteen prior nonviolent misdemeanor convictions, the court concluded that he had a prior criminal history. The court also noted the defendant's failure to comply with the conditions of community supervision. The court also found as a mitigating factor that the victim did not suffer serious bodily injury. In giving slight weight to the fact that the defendant had no prior felony record, the court imposed a twenty-four year sentence in the Department of Correction. Following the denial of his motion for new trial, the defendant filed timely a notice of appeal.

**Analysis**

On appeal, the defendant has raised five issues for our review: (1) whether the evidence is sufficient to support the conviction; (2) whether the court erred in denying the motion to allow the jury to view the crime scene; (3) whether the court erred in allowing the victim to testify she was abused as a child; (4) whether the court erred in admitting statements made by a witness; and (5) whether the sentence is excessive. As addressed below, our review reveals no error in the case.

**I. Sufficiency of the Evidence**

When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Dorantes*, 331 S.W.3d 370, 379 (2011); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[O]n appeal, the State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *Dorantes*, 331 S.W.3d at 379 (internal quotation omitted). It is the trier of fact who resolves all questions of witness credibility, the weight and value of the evidence, as well as all factual issues raised by the evidence. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Reviewing courts

should neither re-weigh the evidence nor substitute their own inferences for those drawn by the jury. *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003). Our supreme court stated the rationale behind this mandate as follows:

> . . . The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

The trial court's approval of the jury's verdict accredits the State's witnesses and resolves all conflicts in the evidence in the State's favor. *State v. Moats*, 906 S.W.2d 431, 433-34 (Tenn. 1995). "Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, on appeal a defendant bears the burden of showing why the evidence is insufficient to support the conviction." *State v. Thacker*, 164 S.W.3d 208, 221 (Tenn. 2005). These rules apply whether the verdict is predicated upon direct evidence, circumstantial evidence, or a combination of both. *Dorantes*, 331 S.W.3d at 379. In weighing the sufficiency of the evidence, circumstantial and direct evidence are treated the same, and the State is not required to exclude every reasonable hypothesis other than that of guilt. *Id*. at 381.

The defendant stands convicted of aggravated rape, which is the unlawful sexual penetration of a victim by the defendant where the defendant causes bodily injury to the victim. T.C.A. § 39-13-502(a)(2) (2010). Sexual penetration, as defined, includes "sexual intercourse, . . . anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal opening of the victim." *Id*. § 39-13-501(7).

The defendant contends that these elements were not established. We include the argument from his brief here:

> . . . Specifically when asked what she meant by penetration, [the victim] said, "just felt somebody inside me." It is submitted that this statement is too vague for a rational trier of fact to understand what she meant. It would be physically impossible for a person to be inside of another person unless one person was extremely small or the other one extremely large, and then it would

undoubtedly cause death to one or the other. The [defendant] is not trying to be facetious. It is necessary for the state to prove penetration, and the victim does not articulate what part of another person's body was in her or if it was an object. She does go on to say that she meant "in my rectum and my vagina" when she said "inside me." She does not, however state what was inside of her. [The defendant] submits that this is too vague and ambiguous to meet the requirement that it be "any part of a person's body or of any object." The evidence is, therefore, insufficient.

We are unable to appreciate or give credence to the defendant's argument. Despite the claim of a lack of facetiousness, we can find no merit to the argument presented. The evidence in the record established that the victim was forced into a bathroom stall and held there while she was brutally raped. The defendant himself does not deny that he did in fact have sex with the victim; he only asserts that it was consensual. The victim denied that it was, and the jury clearly accredited her account of the events. With regard to the defendant's assertion that the testimony is too ambiguous or vague with regard to what it was in the victim's rectum and vagina, he ignores the fact that semen and sperm were found inside both those cavities. To say that the defendant's penis was not present there would belie common sense. Any reasonable trier of fact could have concluded beyond a reasonable doubt in this case that the victim was sexually penetrated by the defendant. Moreover, the record establishes, through the testimony of Ms. Sublette, that bodily injuries resulted from this encounter. There is absolutely no merit to the defendant's claim of insufficiency of the evidence in this case.

## II. Jury View

Next, the defendant contends that the trial court erred in denying the motion to allow the jury to travel to Alfred's to view the scene of the crime. According to the defendant that would have

allowed [the jury] to see the proximity of the restroom to the restaurant and bar area of the night club that was full of people. This would have lent credence to the testimony of the [defendant] that the sex was consensual, because there was no cry for help by the victim when so many people, including her friends, were nearby to help.

The defendant acknowledges that photographs and diagrams of the scene were admitted into evidence, but he claims that "looking at a photograph would not give a juror the same perception of distances as actually being there."

It is within the trial court's discretion to allow the jury to view a crime scene. Thus, we review a trial court's ruling in allowing or denying a jury view for abuse of discretion. *Boyd v. State*, 475 S.W.2d 213, 222 (Tenn. Crim. App. 1971); *State v. Dwight Miller*, No. 02C01-9708-CC-00300, 1998 Tenn. Crim. App. LEXIS 1315 at *37 (Tenn. Crim. App. Dec. 29, 1998). In conducting our review, we note that this court has noted that "a view by the jury is rare in civil cases and rarer still in criminal trials." *State v. Dyron Norm Yorkley*, No. E2009-02646-CCA-R3-CD, 2011 Tenn. Crim. App. LEXIS 357 at **82-83 (Tenn. Crim. App. May 20, 2011).

We are not persuaded by the defendant's argument that the trial court's refusal to allow a jury view in this case was an abuse of discretion. As pointed out by the State, the court considered multiple factors before making the ruling on the motion. Both the defense and the State made the court aware that they planned to introduce exhibits which would depict the size and dimension of the scene, and, in fact, those were presented to the jury. The court also noted, on the record, possible harmful effects of jury views:

> [t]here's potential for abuse in viewing the scene for multiple reasons . . . . One of those is that it's virtually impossible for the appellate record to reflect what the jury saw out there. It's also possible for one juror to see something other jurors don't see or for communications to take place. There's lots of reasons that the Courts take these positions, but there are occasions in which it becomes important and if it becomes important in this case then I'll reconsider this.

Based upon the record, it is apparent that the trial court gave careful consideration to this determination, and nothing reflects that the defendant suffered any harm from the court's refusal.

The State introduced a video recording of the restaurant and the restroom, and the defense introduced pictures of the same. Additionally, the defense called the general manager of the restaurant who testified regarding the layout and dimensions through a sketch/diagram. Thus, the jury was made aware of the size and the area in which these events occurred. It appears that the dimensions of the area were put clearly before the jury.

As also pointed out by the State, the defendant's claim that this would show it was impossible for a rape to occur in such close proximity to other patrons of Alfred's is belied by the fact that there was no evidence presented by the victim that she screamed or fought with the defendant. Moreover, there was no indication that the restaurant was crowded that evening, as it was a weeknight. The defendant himself admits that he and the victim did have sexual intercourse in the bathroom. We are unable to conclude that the court's denial of the

motion was an abuse of discretion.

### III. Prior Sexual Abuse

Next, the defendant contends that the trial court erred by allowing the victim to testify, over defense objection, about prior sexual abuse she suffered as a child. The contested testimony is that the victim was sexually abused as a child, that after each incident she simply returned to the living room, and that she did not tell anyone that it occurred. The State contended that the evidence was admissible to explain why the victim did not report the events in this case to the police immediately. The defendant claims the evidence is not relevant at all and that, even if it is, it should have been excluded as prejudicial.

The Tennessee Rules of Evidence make "all relevant evidence" admissible. Tenn. R. Evid 402. "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. On appeal, this court will review the trial court's decision for abuse of discretion. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

The defendant argues that the testimony in no way tends to make the existence of a fact of consequence to the determination of the case more or less probable. He argues that the testimony that the victim was molested as a child would not prove that she was raped by the defendant in this case and, further, that her actions as a child would only be relevant if the present situation was the exact same as when she was a child. The State responds that the statements were of consequence to determining why the victim acted the way she did after the rape and whether she was being truthful about her claim.

As pointed out by the State, the trial court considered the issue and limited the State on what questions could be asked. The court directed the State to "[g]o straight to the [question of what she would do after the abuse occurred and then] move on." The court stated, "I do think it has some relevance [a]s long as we don't give details, I don't see any harm; [b]ut I don't want to go down this road much further." Those instructions were complied with by the State.

The defendant's argument assumes that the *only* fact of consequence is the ultimate determination of whether she was raped. That is not the standard. Multiple facts of consequence appear in cases that are important and lead to the ultimate determination of guilt

or innocence. On the record before us, we cannot conclude that the trial court abused its discretion by admitting the testimony. We agree with the State that the testimony did have relevance to the question of why the victim reacted in a certain manner and whether she was telling the truth about her reaction, both essential determinations in the case. It aided the jury in determining if the victim was telling the truth when she claimed that she was raped by the defendant, especially in light of the defense grilling of the witness about why she failed to scream for help or seek immediate attention and the inference that she invented the "story" because her boyfriend was angry she stayed out later. Thus, the defendant's own cross-examination of the victim made the evidence even more relevant. We do not see merit to the defendant's contention that the testimony was admitted only to show conformity with a character trait.

We are also unable to conclude that the relevant evidence should have been excluded under Rule 403 because its probative value was substantially outweighed by its prejudicial effect. The defendant contends that the prejudicial effect is that the jury would be more sympathetic to the victim because she had been abused as a child. The defendant offers no proof of this and is simply making a blanket assertion of how the jury would be affected by the fact that the victim had suffered previous abuse. We cannot say that the basic information conveyed briefly to the jury in this case was so unfairly prejudicial to the defendant as to substantially outweigh its relevance. Moreover, even if we were to conclude that the trial court did abuse its discretion by allowing the testimony, the error would be harmless in light of the overwhelming evidence against the defendant in this case. He is entitled to no relief.[1]

## IV. Admission of Statements as Excited Utterance

The defendant also contests the trial court's decision to allow Ms. Lundahl to testify that the victim told her that she had been raped while the two of them were in the restroom of The Map Room. The trial court admitted the hearsay statement after finding that the statement qualified as an excited utterance. The defendant disagrees.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is not admissible unless admission is authorized by the evidence rules or by other controlling provisions of law. *Id.* at 802. One exception to the hearsay rule is for an excited utterance, "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *Id.* at 803(2). Our supreme court has stated three prerequisites to admission pursuant to the excited

---

[1] Tennessee Rule of Evidence 412 was not raised as an issue in this case.

-11-

utterance exception:

> The first requirement is "a startling event or condition" that "'suspend[s] the normal, reflective thought processes of the declarant.'" . . . Second, the statement must "relate to" the startling event or condition. . . . This broad requirement offers "considerable leeway" such that "the statement may describe all or part of the event or condition, or deal with the effect or impact of that event or condition." . . . The third and final requirement dictates that the declarant make the statement while "under the stress or excitement from the event or condition." . . . This requirement considers a variety of factors, including the interval of time between the startling event and the statement.

*State v. Franklin,* 308 S.W.3d 799, 823 (Tenn. 2010) (internal citations and footnotes omitted). The time interval, however, is only one of the considerations that determine whether a statement was made under stress or excitement. *State v. Gordon*, 952 S.W.2d 817, 820 (Tenn. 1997). "Other relevant circumstances include the nature and seriousness of the event or condition; the appearance, behavior, outlook, and circumstances of the declarant, including such characteristics as age and physical or mental condition; and the contents of the statement itself, which may indicate the presence or absence of stress." *Id*. The "ultimate test" for determining the admissibility of an excited utterance is "spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication." *State v. Smith*, 857 S.W.2d 1, 9 (Tenn. 1993).

The defendant argues that the statement to Ms. Lundahl does not qualify as an excited utterance in this case. He bases his argument upon the fact that several hours had passed after the event prior to the statement being made. He relies upon testimony from Ms. Lundahl who stated that the victim "wasn't . . . excited" and "was very blank in the face," which he claims indicates that she was not under any stress of the excitement. He also relies upon the fact that the victim made the decision that she did not want to call the police or have her boyfriend told, indicating she was thinking and rational.

Following review, we conclude it was not an abuse of the trial court's discretion to allow admission of the statement. The defendant's argument appears to require that the victim must have a hysterical reaction to the crime for a statement made to be an excited utterance. That is not the case. As pointed out by the State, "psychologists have proved that victims respond to sexual attacks in no prescribed way." *State v. Kendricks*, 891 S.W.2d 597, 603 (Tenn. 1994). The victim in this case, by her own testimony, was shocked and scared. That she "wasn't excited" or had a "blank face" supports her testimony.

The statement in question was made by the victim to Ms. Lundahl when they were in the restroom together several hours after the rape. It was made directly after the victim observed blood on her clothing and a tissue that she used to wipe herself. It was at that moment that the victim broke down crying and made the statement that she had been raped. The trial court concluded that the victim remained in a state of shock at the time the statement was made. The court considered the appropriate facts and circumstances, and we discern no abuse of discretion in its determination.[2]

## V. Excessive Sentence

Lastly, the defendant contends that the trial court erred in imposing an excessive sentence. He contends that the twenty-four year sentence imposed by the trial court is "in effect" a maximum sentence and should not be given to a defendant with no felony record. Citing to an incorrect standard of review, (de novo with a presumption of correctness), he appears to urge that the proper sentence is the minimum within the range.

When an accused challenges the length, range, or manner of service of a sentence, this court will review the trial court's decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). This presumption of reasonableness is granted to "within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id*. at 707; *see also* T.C.A. §§ 40-35-102, -103.

It remains "critical" that a trial court adhere to the statutory requirement set forth in Tennessee Code Annotated section 40-35-210(e), which requires a trial court to place on the record what enhancement or mitigating facts it considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing. *Id*. at 705 n41. If, however, the trial court has failed altogether to place on the record any reason for a particular sentence, the "appropriate course of action" for an appellate court is to remand to the trial court because the trial court is "in a superior position to impose an appropriate sentence and articulate the reasons for doing so." *Id*. If the trial court has set forth reasons for the sentence, the "sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute. *Id*. at 709-10. Under these circumstances, this court may not disturb the sentence even if a different result was preferred. *State v. Carter*, 254 S.W.3d 335,

---

[2]Both the State and the defendant point out that the trial court noted that the statement could also have been admitted under the fresh complaint exception. Each address the propriety of the statement in that regard. However, we do not, as our reading of the statements made by the trial court indicate that the decision to admit was based upon a finding that the statement was an excited utterance.

346 (Tenn. 2008). Pursuant to the Sentencing Commission Comments to Tennessee Code Annotated section 40-35-401(d), the appellant has the burden of showing that the sentence is improper. *Id*.

Nothing in this record supports the assertions that the trial court failed to properly exercise its discretion in sentencing the defendant to a within-range sentence in accordance with the purposes and principles of the Sentencing Act. As previously noted, the defendant was sentenced, as a Range I standard offender, to a term of twenty-four years, one year below the maximum allowable sentence in that range. The trial court properly cited two enhancing factors and one mitigating factor on the record. The court made very detailed findings which are supported by the record. The defendant is entitled to no relief.

## CONCLUSION

Based upon the foregoing, the judgment of conviction and resulting sentence are affirmed.

_____

JOHN EVERETT WILLIAMS, JUDGE